58 N.J. Super. 511 (1959)
156 A.2d 720
CHARLES VARRIANO AND LINDA VARRIANO, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
ISIDORE MILLER AND HELEN MILLER, HIS WIFE, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 5, 1959.
Decided December 21, 1959.
*514 Before Judges GOLDMANN, FREUND and HANEMAN.
Mr. Seymour Margulies argued the cause for plaintiffs-appellants (Mr. John J. Pagano, attorney; Messrs. Levy, Lemken & Margulies, of counsel; Mr. Margulies, on the brief).
Mr. Mortimer Neuman argued the cause for defendants-respondents (Mr. Harold Meltzer, attorney; Mr. Neuman, on the brief).
The opinion of the court was delivered by FREUND, J.A.D.
This is an action concerning the rights of adjoining property-owners under an easement agreement. Plaintiffs Charles Varriano and his wife appeal from a final judgment of the Chancery Division dismissing their amended complaint and adjudging that the defendants Isidore Miller and his wife are entitled to relief on their counterclaim.
The Varrianos and the Millers have their permanent residences in Jersey City. In 1955 and for some years prior thereto the parties were very friendly. They went on picnics together at Lake Hopatcong and both families liked the area. In the spring of 1955 Charles Varriano was "looking for a place to buy." A real estate agent showed him property at Lake Hopatcong owned by Hans Fuetterer. The lot had about 150 feet of lake frontage. There were two dwellings thereon, and the total price was $42,000.
*515 The parties agreed to purchase the property together and had a survey prepared dividing the parcel into two lots. The Millers paid $27,000 for the larger home, on the northerly half. The Varrianos paid $15,000 for the smaller home, on the southerly half. Both lots had lake frontage on the east and fronted on Maxim Drive on the west. Mr. Fuetterer had occupied the home which the Millers acquired and had rented what became the Varriano home.
The evidence reveals that access to the respective homes is gained primarily by a single 12 foot wide common driveway which leads from Maxim Drive onto the plaintiffs' property, crossing in front of the Varriano dwelling and then making a complete circle in front of the Miller home. But the Varriano property, although possessed of the principal vehicular approach, had no independent water supply. The well supplying drinking water was located on the Miller lot, and the pump for this well was located in the basement of the Miller house. Moreover, there was another pump in the Miller boathouse which was used to provide lake water to both houses for hot water and toilet facilities. Both the well and lake water pumps were controlled by electric switches located in the Miller home. Water from both sources was pumped to the two houses through underground pipes.
Upon their simultaneous purchases from Mr. Fuetterer in June 1955, the parties had an oral understanding that the Millers could use the driveway as it then existed across the plaintiffs' property, and the Varrianos would be furnished with water from the defendants' facilities.
In December 1955 an agreement was executed by the parties. It contained four separate paragraphs, the first two reading:
"1. The First Party [the Varrianos] hereby grants unto the Second Party, their heirs and assigns, an easement and right of way to the present driveway and common entrance, now used on said property, for ingress and egress and as and for driveway purposes.
2. The Second Party [the Millers] grants unto the First Party, their heirs and assigns, the right to the use of the well and pump *516 which is now located on the property, and the right to use lake water and pump. The Second Party agrees to the outright purchase of any new equipment such as pumps, etc. The First Party will only share the cost of maintenance."
In the third paragraph they agreed to share maintenance costs of the driveway, well, lake-water pump and entrance gate; and in the fourth, each was given first option to purchase the other's property.
Charles Varriano testified that there had been an earlier agreement drafted by Miller which expressly permitted the defendants to shut off the water on October 15. Plaintiff stated he had refused to sign that proposal because he objected to the shut-off date, his intention being "to use the place in the future as a home to live at and convert it to an all-year-round house." When his objection was made known to the defendant, the time limitation was intentionally omitted from the executed agreement. The unexecuted draft had been on a "rough piece of paper" which was not available at the trial.
It is clear, however, that the parties did in fact orally agree that defendants could shut off the water at some "appropriate time" to prevent water from freezing in the underground pipes. Thus, plaintiff testified:
"Q. There was no mention about [the date]? A. Not mentioned in the paper but we understood that we would turn it off in freezing weather.
Q. You understood that yourself? A. Yes. Freezing weather up there isn't October 15.
Q. It was understood that Mr. Miller would have the right to turn off the water when the freezing weather came? A. We talked about it. We discussed when he should shut it off.
Q. You understood it was to be turned off to avoid freezing of the pipes. A. Yes, sir.
Q. And did that mean both the well water and the lake water? A. Well, it meant both but the lake water is always turned off first because the pump is near the water line.
Q. You understood that that understanding, so to speak, was to be considered a part of your contract with Mr. Miller, did you? A. The contract we did make an understanding that I was supposed to use that in the future when I wanted to live there all year round. That is the purpose for leaving the date out. I had people *517 up there I know that shut there (sic) water off in November, Thanksgiving Day, and that was my intention."
From 1955 to 1957 disputes arose between the parties respecting the dates when defendant should shut off the water. Mr. Miller, however, testified that in the autumns of 1955 and 1956 the Varrianos "agreed" that he could turn the water off during the second or third week of October. This was denied.
In the summer of 1957 there was a water drought, and the well for drinking water went dry during the Labor Day weekend; it did not fill again until the spring of 1958. Plaintiffs say the defendants also turned off the lake water on September 29, 1957, requiring them to leave their home. But Mr. Miller testified that he visited the lake on the first weekend of October 1957, smelled rubber insulation burning in his boathouse, and found the pump there "hot as can be." He discovered that the difficulty was caused by the act of the plaintiffs in keeping the water running and the pump operating continuously. To prevent a fire, defendant shut the power off. He was subsequently obliged to repair the damaged pump. Defendants' version was that the Varrianos were never deprived of water or, if they were, it was either due to the drought, to the onset of cold weather, or to their own act.
In 1958 plaintiffs dug their own well and have not made further use of the defendants' facilities. Mr. Miller testified that while this work was proceeding a ditch was dug, depriving the defendants of the use of the driveway for a two-week period.
The Varrianos instituted suit in 1958. By amended complaint they demanded cancellation of the easement agreement, damages for defendants' breach of the agreement to supply water, and an order restraining the defendants from using the driveway. The Millers counterclaimed for an order enjoining plaintiffs from interfering with use of the driveway and for an order requiring plaintiffs "to faithfully perform all of the terms and conditions of the agreement."
*518 The Chancery Division denied relief to plaintiffs on the ground that parol evidence established that it was not intended that plaintiffs be supplied water after that season of the year when freezing in the pipes would occur, that no agreement was reached as to when this date would be, and consequently that "the undertakings in paragraph two were so indefinite and so uncertain as to time of performance on the part of the defendant as to make the contract unenforceable." The court also denied relief to the defendants on their counterclaim because it found that to enforce the driveway easement would result in "a complete lack of the required mutuality" and that the parties evidently "intended mutual undertakings." The court's conclusion that the agreement was unenforceable by either party was stated to be without prejudice to the defendants' right to establish an easement by prescription or an easement by necessity in further litigation.
Upon defendants' motion to reopen the judgment pursuant to R.R. 4:61-1, the court altered its prior holding by ruling that the "defendant's easement should be sustained even though that of the plaintiff is unenforceable." This judgment was based on the finding that ingress and egress over the driveway was necessary for beneficial enjoyment of the Miller property and that hardship would result from deprivation of the easement.
On this appeal plaintiffs first urge that the trial judge erred in admitting parol testimony relating to the shut-off date. It is argued that the second paragraph of the agreement contains no time limitation on the right to use the pumps, and that since the mutual engagements were deliberately put into a writing, parol testimony could not be resorted to in support of a finding that the parties intended something other than what appeared therein. Just as parol testimony is not admissible for the purpose of varying or contradicting the terms of an integrated contract, Naumberg v. Young, 44 N.J.L. 331 (Sup. Ct. 1882); Platt v. Currie, 100 N.J. Eq. 543, 545 (E. & A. 1926), *519 plaintiffs maintain such evidence was not a proper basis for the court's conclusion that the obligation to supply water was indefinite and unenforceable.
This contention encounters the difficulty that if the trial judge refused to consider the parol evidence, he would have been required to enforce a written contract which, as Mr. Varriano's own testimony established, was plainly not a complete embodiment of their actual agreement. Not only does the testimony of both litigants demonstrate an agreement that the pumps could be shut off in freezing weather, but each party had a different conception of the extent, in point of time, of the Millers' obligation. We find what was said in Meola v. Gorga, 27 N.J. Super. 390, 395 (App. Div. 1953), particularly responsive to the plaintiffs' argument:
"The core of a contract is the agglutinated intentions of the parties thereto. Where the parties have fully reduced their agreement to writing, the general rule of evidence enunciated in the familiar decision rendered in Naumberg v. Young, 44 N.J.L. 331 (Sup. Ct. 1882), forbids the admission of oral testimony of what was said by the parties during the preliminary negotiations for the purpose of contradicting, supplementing, or innovating the terms of the writing. The restraint of this rule is not applicable where the written contract is manifestly not intended to be complete or is accordingly silent with respect to certain essential particulars constituting the subject matter of the litigation. In such a situation the court is permitted to receive and consider the parol evidence offered by the parties expressive of those particulars which the parties thought unnecessary to embody in the writing, which are not in conflict with its terms and which in fact were encompassed by the intended bargain." 27 N.J. Super., at page 395.
See also Polakoff v. Halphen, 83 N.J. Eq. 126, 129 (Ch. 1914); 3 Corbin, Contracts, §§ 582, 583 (1951). Cf. Krosnowski v. Krosnowski, 22 N.J. 376, 387 (1956); West Caldwell v. Caldwell, 26 N.J. 9, 24, 25 (1958).
Plaintiffs next argue that an easement is an interest in real estate for purposes of the statute of frauds, R.S. 25:1-1 and R.S. 25:1-5, subd. d, and that all of the terms agreed upon, including that pertaining to the water *520 shut-off date, were required to be in the writing. But R.R. 4:8-3 requires an affirmative pleading of the statute. And there is no mention of the statute of frauds either in the pleadings, including plaintiffs' answer to counterclaim, or in the pretrial order. As a result, this issue could not be raised at the trial and is not cognizable on appeal. Edwards v. Wyckoff Electrical Supply Co., 42 N.J. Super. 236, 240-41 (App. Div. 1956).
It is also suggested that defendants lost any easement right they may have had in the driveway by breaching their duty to supply water. This argument overlooks that there was ample evidence that Miller did not deprive the Varrianos of the right to use water, except during the colder weather as actually contemplated and agreed by the parties. Additionally, there was evidence that Miller's shutting off the power to the pump in October 1957 was traceable to Varriano's act of leaving his valve open and draining the system excessively. Plaintiffs did not sustain the burden of proving any breach of contract by defendants and are not entitled to damages.
Plaintiffs' final contention is that there is a basic unfairness and a manifest denial of equity if defendants' right to the use of the driveway is judicially vindicated, when plaintiffs' right to the use of the water system is declared unenforceable on grounds of uncertainty. It is urged that the trial judge, having originally found that the parties evidently "intended mutual undertakings," proceeded to violate principles of mutuality of obligation and mutuality of relief in ultimately finding the driveway easement enforceable. Defendants reply that the issue of failure of consideration was not affirmatively pleaded, R.R. 4:8-3, and that in any event the agreement of December 12, 1955 was a sealed instrument. As to the effect of the seal, see N.J.S. 2A:82-3, providing a rebuttable presumption of consideration therefor.
We find the issues thus posed unnecessary to resolve. While it is clear that the parties deliberately refrained from mentioning *521 a shut-off date in the agreement, it is also clear that they did in fact agree that the water could be turned off at some time to prevent freezing in the water pipes. If it would be unfair to plaintiffs to deprive them of any reciprocal benefits under the exchange, it would be more unfair to hold that plaintiffs have a right to cancel the agreement; a mandate in effect compelling defendants to construct a new driveway, at great expense and at great inconvenience, would be plainly at variance with the intent of the parties when they purchased these properties and when they entered into their agreement. It also appears, although the record is somewhat obscure in this respect, that the construction of a new driveway from defendants' home to Maxim Drive would not be practicable. Under no circumstances, therefore, is it reasonable or just to hold that the Millers are to be deprived of their driveway easement. See Galway v. Fullerton, 17 N.J. Eq. 389, 392 (Ch. 1866); City of Newark v. Lodato, 139 N.J. Eq. 471, 475 (Ch. 1947); 9 Am. Jur., Cancellation of Instruments, § 5 (1937); 12 C.J.S., Cancellation of Instruments, § 3, p. 944, text at n. 24 (1938).
We also find, however, that whatever indefiniteness besets defendants' undertaking to supply water is capable of clarification by the introduction of further proofs regarding the custom of the community as to the time of draining water systems. Leave is therefore granted to either party to submit to the Chancery Division, within 60 days, additional evidence pertaining to such custom. Upon the establishment of specific dates to the trial court's satisfaction, the extent of the defendants' obligation to supply water should be adjudged accordingly. Failing the introduction of further proofs within the time specified, the agreement will be construed as permitting plaintiffs the use of defendants' water facilities from April 15 to October 15, and the judgment presently under review will be affirmed as modified in the light of the foregoing.
So ordered.