RAYMOND B. MITCHELL AND BEVERLY MITCHELL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1406-73.    Filed March 4, 1976.

---

*Robert L. Whitmire* and *Malcolm George Smith,* for the petitioners.

*Gregory A. Robinson,* for the respondent.

OPINION

In 1966 Royal Industries, Inc., acquired all of petitioner's stock in Amerco, Inc., for $4 per share and, in addition, acquired petitioner's 22,137-share Amerco stock option. Petitioner remained in the employ of Amerco after the Royal takeover at a reduced salary and received a nonstatutory stock option to purchase 10,000 shares of Royal stock.

The issues remaining to be decided are whether the Royal option granted to petitioner in 1966 was granted in exchange for petitioner's Amerco option or in lieu of salary, whether extrinsic evidence is admissible to show the consideration given for the Royal option, whether the gain on sale of the Royal option was ordinary income or capital gain, and whether the Royal option had a readily ascertainable fair market value on the date of grant.

Petitioner contends that since the Royal option was received in exchange for the Amerco option, the subsequent transfer of the Royal option to Mr. Singleton should be governed by section 1234 of the Internal Revenue Code of 1954,[6] and give rise to capital gain. Furthermore, petitioner argues the option-for-option exchange was a taxable event and gain was realized in 1966 (a year not before the Court). Respondent, on the other hand, contends section 1234 is inapplicable because the Royal option was compensatory in nature (whether granted in lieu of salary or in exchange for the Amerco option), and any gain realized from the transfer of the Royal option to Mr. Singleton was ordinary income. Respondent adds that no taxable event occurred in 1966 with respect to the above transactions.

Section 61(a)(1) provides that gross income includes compensation for services. Section 1.61-15, Income Tax Regs., states that: "If any person receives an option in payment of an amount constituting compensation of such person * * *, such option is subject to the rules contained in § 1.421-6 for purposes of determining when income is realized in connection with such option and the amount of such income."

To determine whether the provisions of section 1.421-6, Income Tax Regs., apply to the stock option granted by Royal to petitioner, we must decide whether that option was granted as compensation within the meaning of section 61(a)(1).

---

[6] All statutory references herein refer to the Internal Revenue Code of 1954, as in effect for the years relevant to this litigation.

However, initially we note that we do not subscribe to petitioner's contention that we are precluded from looking beyond the written documents entered into evidence by the parole evidence rule as enunciated in *Commissioner v. Danielson,* 378 F. 2d 771 (3d Cir. 1967), or *Clark v. United States,* 341 F. 2d 691 (9th Cir. 1965). In our case, none of the documents expressly declares the sole consideration given for the Royal stock option. The option agreement itself refers to "other good and valuable consideration" without delineating just what that consideration is. Parole evidence, therefore, is not being admitted to vary the terms of the contract, but rather to explain what those terms mean. *Estate of Leon Holtz,* 38 T.C. 37, 41 (1962). See also *Estate of Richard F. O'Brien, Jr.,* 57 T.C. 27, 30 (1971); *S. E. Brown,* 52 T.C. 50, 59-60 (1969).

Additionally, the documents themselves are ambiguous on the issue of whether the option was compensatory. Paragraph 1 of the Royal option agreement states that the option was issued to the grantee "as a matter of separate inducement and agreement in connection with his employment by the Company or a subsidiary of the Company, and not in lieu of any salary or compensation for his services."

This Court is hard pressed to envision situations where the grant would be "in connection with" one's employment yet not constitute compensation. But even if paragraph 1 could be read as petitioner desires, to indicate the option was not granted as compensation, paragraph 11 of the option suggests otherwise: "Grantee, in consideration of the granting to him of this option, hereby agrees to remain in the employ of the Company * * * unless prevented by death for a period of one (1) year from the granting of this option." This latter paragraph tends to show that the option was indeed granted as compensation and thus conflicts with paragraph 1. We must, therefore, look beyond the written agreement to the entire record to decide whether the Royal option granted to petitioner was compensatory in nature. *Jack F. Morrison,* 59 T.C. 248, 256 (1972).

Robert C. Sherbourne, an executive of Royal, testified that a key factor in determining the number of shares subject to the option granted to petitioner was petitioner's reduction in salary from $44,000 per year to $38,000 per year after the Royal takeover. Petitioner himself acknowledged that a salary reduction was discussed in connection with the consideration he

was to receive from Royal in exchange for his Amerco stock option. He argues, however, that the option agreement, as finally constituted in writing, differed from the negotiations leading up to the agreement, in that the final agreement did not contemplate a reduction in salary. We disagree. As stated previously, the stock option agreement refers to "other good and valuable consideration" without stating just what that consideration is. A reasonable inference to be drawn from the record is that a salary reduction was indeed part of the consideration given for the stock option granted to petitioner. Indeed, Mr. Sherbourne so testified and a letter from Mr. Sherbourne to petitioner, dated April 6, 1966, corroborates his testimony. This letter indicates that 40 percent of the 10,000-share nonstatutory stock option offered to petitioner (i.e., 4,000 of the 10,000 shares subject to the offer) was granted in exchange for petitioner's salary reduction of $6,000 per year for 5 years. This 40 percent of the Royal option clearly represented compensation for future services. Petitioner has failed to carry his burden to show that "from an examination of all the surrounding circumstances, there was no reason for the option to have been granted as the payment of an amount constituting compensation." Sec. 1.61-15(b)(2), Income Tax Regs. The disposition of this 40 percent of the Royal option is governed by section 1.421-6, Income Tax Regs., and gives rise to ordinary income in the manner discussed later.

Petitioner has persuaded us, however, that the remaining 60 percent of the Royal option was granted in exchange for petitioner's old Amerco option. Much of the evidence adduced at trial indicates that Royal wished to retire all outstanding Amerco options and issue its own options in their place. Petitioner's evidence shows an option-for-option exchange was contemplated by the parties, at least in part, and the testimony of Mr. Sherbourne confirms this. But this is not to say, as petitioner argues, that the exchange causes the income realized on the subsequent sale of the Royal option to be characterized as capital gain. In our view, all the gain is ordinary income.

Section 1234(a) states:

Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, a privilege or option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as

the property to which the option or privilege relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him).

Petitioner contends that this section governs his sale of the Royal option to Mr. Singleton, and that since the stock subject to the option would be a capital asset in his hands, the gain realized by him on sale is capital gain. However, subsection (d) of section 1234 provides exceptions to the general rule:

This section shall not apply to—
    * * *

    (2) in the case of gain attributable to the sale or exchange of a privilege or option, any income derived in connection with such privilege or option which, without regard to this section, is treated as other than gain from the sale or exchange of a capital asset;

The regulations interpret this exception to make section 1234 inapplicable in the area of employee stock options issued as compensation. Section 1.1234-1(e), Income Tax Regs., states:

Section 1234 does not apply to gain resulting from the sale or exchange of an option—
    (1) To the extent that the gain is in the nature of compensation (see sections 61 and 421, and the regulations thereunder, relating to employee stock options);

Section 1234 is clearly not applicable to that 40 percent portion of the Royal option granted in lieu of petitioner's salary. As to the remaining 60 percent, it is our opinion that section 1234 is again not applicable. But to determine whether the gain on the sale of this latter portion of the Royal option represents compensation, we must look first at the nature of the Amerco option for which it was exchanged.

Petitioner testified that the Amerco option was a restricted stock option identical to the Western Rubber option granted him in 1961 except for price and number of shares.[7] Paragraph 1 of the stock option plan, incorporated into all Western Rubber options, indicates that the options were issued to retain the services of key employees. Paragraph 5(a)(1) of the plan requires that the options may not be exercised until the employee has worked for 6 months following the date of grant. Since these terms were also in the Amerco option, we think this shows the Amerco option granted to petitioner was a compensatory,

---

[7] The Amerco option agreement is absent from the record because petitioner's business office was burglarized in 1965 and the option papers were missing after that time. Our conclusion that the terms of the Amerco option were identical with the Western Rubber option (subject to the noted differences) is based solely on petitioner's testimony.

restricted stock option. As stated in *Commissioner v. LoBue,* 351 U.S. 243, 247 (1956):

When assets are transferred by an employer to an employee to secure better services they are plainly compensation. It makes no difference that the compensation is paid in stock rather than in money. * * * LoBue received a very substantial economic and financial benefit from his employer prompted by the employer's desire to get better work from him. This is "compensation for personal service" within the meaning of [sec. 61(a)] * * *

Since the Amerco option was a compensatory stock option, section 1234 was not applicable to its disposition. *Donald H. Kunsman,* 49 T.C. 62 (1967). Similarly, such disposition was not controlled by the provisions of section 421, because in order for a taxpayer to obtain capital gain treatment under section 421, the option must be exercised, the stock held for the requisite·period and then sold according to the provisions of the statute. Where the option itself is transferred or canceled prior to exercise, section 421 is not applicable, and the gain realized on such cancellation or transfer is compensation. *Donald H. Kunsman, supra.* See also *Rank v. United States,* 345 F. 2d 337 (5th Cir. 1965); *Dugan v. United States,* 234 F. Supp. 7 (S.D. N.Y. 1964); *Nathan Putchat,* 52 T.C. 470, 477 (1969).

Therefore, the disposition of the Amerco stock option prior to exercise gave rise to compensation in the amount of the gain realized. The 60-percent portion of the Royal option received by petitioner in exchange for his Amerco option was that compensation. As in *LoBue:* "It makes no difference that the compensation is paid in stock rather than in money." 351 U.S. at 247. In our case, the compensation took the form of a stock option, and even though granted in exchange for another option, it was, nonetheless, compensation.

There is no reason to presume that this exchange of options does not give rise to the realization of income under section 1001. Indeed, petitioner contends the exchange was a taxable event (although he did not report it as such on his income tax return for 1966). However, we think that if the Royal option had no readily ascertainable fair market value on the date of exchange, it is inappropriate to compute petitioner's tax at that time. Rather, the tax is imposed when the Royal option is later transferred or exercised. The Court stated in *Commissioner v. LoBue, supra:*

It is of course possible for the recipient of a stock option to realize an immediate taxable gain. * * * The option might have a readily ascertainable

market value and the recipient might be free to sell his option. But this is not such a case. * * * Under these circumstances there is no reason for departing from the Treasury practice. The taxable gain to LoBue should be measured as of the time the options were exercised and not the time they were granted. [351 U.S. at 249.]

Since both portions of the Royal option represented compensation to petitioner, the gain on sale of the entire option is taxed according to principles set out in the *LoBue* decision. Those principles are codified in respondent's regulations. Section 1.421-6(c), Income Tax Regs., provides in part:

(1) * * * If an option to which this section applies does not have a readily ascertainable fair market value at the time the option is granted, the time when the compensation is realized and the amount of such compensation shall be determined under paragraph (d) of this section.

(2) Although options may have a value at the time they are granted, that value is ordinarily not readily ascertainable unless the option is actively traded on an established market. * * *

(3)(i) When an option is not actively traded on an established market, the fair market value of the option is not readily ascertainable unless the fair market value of the option can be measured with reasonable accuracy. For purposes of this section, if an option is not actively traded on an established market, the option does not have a readily ascertainable fair market value when granted unless the taxpayer can show that all of the following conditions exist:

(*a*) The option is freely transferable by the optionee;

(*b*) The option is exercisable immediately in full by the optionee;

(*c*) The option or the property subject to the option is not subject to any restriction or condition (other than a lien or other condition to secure the payment of the purchase price) which has a significant effect upon the fair market value of the option or such property; and

(*d*) The fair market value of the option privilege is readily ascertainable in accordance with subdivision (ii) of this subparagraph.

Subdivision (ii) states that the fair market value of the option is not readily ascertainable unless the value of the option privilege can be measured with reasonable accuracy. To ascertain the value of the option privilege consideration must be given to the following:

(*a*) Whether the value of the property subject to the option can be ascertained;

(*b*) The probability of any ascertainable value of such property increasing or decreasing; and

(*c*) The length of the period during which the option can be exercised.

No evidence appears in the record showing Royal options were actively traded on an established market. We must decide then whether the fair market value of the Royal option granted to

petitioner can be determined ,with "reasonable accuracy" using the test of section 1.421-6(c)(3), Income Tax Regs.

Paragraph 6 of the option states that no certificates for Royal's shares of common stock may be acquired prior to the admission of such shares to listing on notice of issuance of any stock exchange on which stock of the same class is listed. The record gives no indication whether this condition was met at the time of grant and we will not so presume.

A further restriction appears in paragraph 11 of the option requiring petitioner to remain in the employ of Royal for at least 1 year. Just what impact this requirement has on the value of the option is not presented in the evidence, but because the restriction is significant, it casts doubt over the value of the option, and renders us unable to ascertain the option's value with reasonable accuracy.

Petitioner has also failed to establish the value of the Royal option privilege. At trial, petitioner testified the option privilege on the Amerco option was worthless to him, the Amerco option itself was worth $36,744, and the Royal option was worth the same. Petitioner does not, however, claim to be an expert in the valuation of stock options. Furthermore, his opinion of what the Amerco option or the Amerco option privilege is worth to him is not persuasive to us on the fair market value of the Royal option privilege. Cf. *Frank L. Shamburger,* 61 T.C. 85, 94 (1973).

Petitioner argues that pursuant to the principles enunciated in *United States v. Davis,* 370 U.S. 65 (1962), the value of the option received (the Royal option) should be presumed to be the value of the option given in exchange (the Amerco option). See also *Philadelphia Park Amusement Co. v. United States,* 126 F.Supp. 184 (Ct. Cl. 1954). In *Philadelphia Park* the court was trying to determine the taxpayer's basis in a 10-year franchise (to operate a passenger railway) received in exchange for a bridge. Ordinarily, the basis in the franchise would be its fair market value on the date of transfer, but that value was not ascertainable. The court concluded that the fair market value of the bridge given in exchange should be presumed to be the fair market value of the franchise. However, the court noted that if the fair market value of the property given up also could not be ascertained then no taxable event occurred. See *Gould Securities Co. v. United States,* 96 F. 2d 780 (2d Cir. 1938). Such is our case.

We recognize "it is only in rare and extraordinary cases that the value of the property exchanged cannot be ascertained with reasonable accuracy." *Philadelphia Park Amusement Co. v. United States, supra* at 189. Sec. 1.1001-1(a), Income Tax Regs. But we think the value of stock options (which are not traded on an established market) can be particularly difficult to ascertain. The Supreme Court recognized this in *Commissioner v. LoBue, supra,* and respondent has incorporated this notion in his regulations. Sec. 1.421-6(c), Income Tax Regs.

In the present case, we have only petitioner's testimony of a value of $36,744 for the Amerco option. We think petitioner has failed to accurately value the Amerco option privilege or take into consideration the restrictions contained in the Amerco option in reaching his conclusions of value. Moreover, petitioner has failed to take into account Royal's willingness to pay more for the Amerco option (as it did for the Amerco stock) than the option could have been sold for on the open market.[8] In short, we are not convinced by petitioner's testimony that the Amerco option had a readily ascertainable fair market value in June 1966. Consequently, we cannot assign any fair market value to the Royal option received in the exchange.

Since the Royal option had no readily ascertainable fair market value on the date it was granted to petitioner, its disposition is governed by the provisions of section 1.421-6(d)(3), Income Tax Regs., which provides:

If the option is not exercised by the person to whom it was granted, but is transferred in an arm's length transaction, the employee realizes compensation in the amount of the gain resulting from such transfer of the option, and such compensation is includible in his gross income in accordance with his method of accounting.

Under this regulation petitioner realized ordinary income from the transfer of his Royal option to Mr. Singleton in December

---

[8] There has been some discussion by both parties suggesting that Royal "guaranteed" a minimum return to petitioner of $22.75 per share for each of the shares acquired pursuant to the exercise of the Royal option. Since the option price per share was $12, this would result in a total "guaranteed" profit to petitioner of $107,500 on all 10,000 shares. Neither party claims this figure represents the fair market value of the Royal option. While it is true the option agreement indicates Royal will pay the difference between $22.75 per share and the lower fair market value of such shares on the date of exercise under certain circumstances, the payment is subject to contingencies and modifications. We cannot conclude that this "guaranteed" amount establishes a readily ascertainable fair market value for the Royal option. It does, however, indicate to us a willingness on the part of Royal to exchange property for the Amerco options worth greatly in excess of the $36,744 figure used by petitioner as the value of the Amerco options.

1967 and January 1968. However, since no payments were received in 1967, and petitioner reported his income on the cash receipts and disbursements method of accounting, respondent has conceded that petitioner realized ordinary income only as payments were received, beginning in 1968.

Because of concessions,

*Decision will be entered under Rule 155.*