ESTATE OF MURRAY J. SIEGEL, DECEASED, FREDERICK ZISSU AND NORMAN LIPSHIE, EXECUTORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1685–76.     Filed June 30, 1980.

---

*Michael S. Barron* and *Thomas R. Schuttish,* for the petitioner.*

*Patrick E. Whelan,* for the respondent.

CHABOT, *Judge:* Respondent determined a deficiency in Federal estate tax against petitioner in the amount of $382,815.89. The other issues in this case having been severed for trial at a later date, the single issue now presented for decision is whether the commuted value of amounts payable to decedent's children under an employment contract between decedent and his employer is includable in decedent's gross estate either—

(1) Under section 2039(a),[1] because decedent might have been entitled to postemployment disability benefits under the employment contract, or

(2) Under section 2038(a)(1), because decedent retained a power to alter, amend, or revoke his children's rights under the employment contract.[2]

## FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

---

*Briefs amici curiae were filed by Gerald H. Litwin (as attorney for Sherry Jene Siegel) and by Michael I. Saltzman (as attorney for Arlene Siegel and Robert Siegel). See *Estate of Siegel v. Commissioner,* 67 T.C. 1033, 1042–1043 (1977).

[1] Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect as of decedent's death.

[2] In the notice of deficiency, respondent determined that the value of the payments under the employment contract is includable in decedent's gross estate "since the decedent, under the terms of the employment contract, had an interest in property at the date of his death which he could alter, amend, revoke or terminate. See Sections 2033, 2036, 2038 and 2039." At trial and on brief, respondent appears to have abandoned reliance on secs. 2033 and 2036, and so the applicability of these two sections will not be considered in this opinion. See *Estate of Fusz v. Commissioner,* 46 T.C. 214, 215 n. 2 (1966).

Frederick Zissu and Norman Lipshie are petitioner's executors. When the petition in this case was filed, (1) petitioner's address was c/o Frederick Zissu, Executor, 174 Passaic Street, Garfield, N.J.; (2) Frederick Zissu resided in North Caldwell, N.J.; and (3) Norman Lipshie resided in New York, N.Y. At the time of his death, decedent Murray J. Siegel was domiciled in New Jersey.

Decedent died of a coronary occlusion on September 21, 1971, at the age of 57. Immediately before his death, decedent was employed by Vornado, Inc. (hereinafter sometimes referred to as Vornado), as its president and chief executive officer. He was also a member of Vornado's board of directors. Decedent served as president for the 6 years immediately before his death. Decedent was actively employed by Vornado until immediately before his death.

On September 30, 1965, decedent entered into a written employment agreement with Vornado, the relevant portions of which are as follows:

WHEREAS, SIEGEL [decedent] has been in the employ of the CORPORATION [Vornado], or a lessee thereof, as an officer for a period of at least five (5) years; and

WHEREAS, SIEGEL has made significant contributions to the successful management of the CORPORATION; and

WHEREAS, the CORPORATION is desirous of having SIEGEL continue to serve the CORPORATION, and SIEGEL is willing to so do if monetary provision is made for the care of SIEGEL's family subsequent to the death of SIEGEL and similar provision is made for SIEGEL in the event of his disability;

Now, THEREFORE, in consideration of the premises, it is covenanted and agreed by and between the parties hereto as follows, to wit:

FIRST: The CORPORATION agrees to employ SIEGEL and SIEGEL agrees to serve the CORPORATION upon the terms and conditions hereinafter set forth.

SECOND: This agreement and the employment of SIEGEL hereunder shall commence on October 1, 1965 and shall continue to October 1, 1973.

THIRD: SIEGEL agrees to serve the CORPORATION faithfully and to the best of his ability, and to continue to serve the CORPORATION on the same terms and conditions as have heretofore been in effect at a salary of no less than Ninety Thousand ($90,000.00) Dollars per annum.

FOURTH: The CORPORATION shall pay to SIEGEL, if living, or to others in the event of his death the following sums upon the terms and conditions and for the periods hereinafter set forth:

(a) In the event of death or disability of SIEGEL on or before the expiration date of this agreement while in the employ of the CORPORATION, the CORPORATION shall pay to him, if living, or others (as hereinafter provided)

in the event of his death, monthly, the following sums which shall be in lieu of any and all payments provided for in Paragraph "THIRD" hereof:

(i) An amount equal to the balance of the monthly salary then payable to SIEGEL up to the end of the month in which death occurs or in which his employment is duly terminated because of disability.

(ii) An amount equal to his then monthly salary rate for all successive months up to the expiration date of this agreement.

(b) Payments of the monthly sums herein-above provided for shall begin at the end of the month set forth in subparagraph "(a)(i)" hereof. Such payments shall be made to SIEGEL if living, otherwise divided equally among SIEGEL'S children, living at the time of each scheduled payment. In the event there are no living children payment shall be made to the Estate of SIEGEL.

FIFTH: Neither SIEGEL nor his children shall have any right to commute, encumber or dispose of the right to receive payments hereunder, which payments and the right thereto are expressly declared to be non-assignable and non-transferable. No right or interest is hereby granted to the children of SIEGEL except as set forth herein and such rights or interests are subject to any modification of this agreement by the mutual consent of SIEGEL and the CORPORATION.

SIXTH: This agreement shall be binding upon the parties hereto, their heirs, executors, administrators, successors or assigns, and supersedes all previous employment contracts for the periods provided herein.

The September 30, 1965, agreement was amended on October 24, 1967, to extend the term of employment from October 1, 1973, to September 30, 1977, to specify that decedent "shall be employed as President of Vornado," and to increase the stated salary from $90,000 to $100,000 per year. The agreement was amended again on November 22, 1969, to extend the term of employment to November 30, 1979, and to increase the stated salary to $125,000 per year. (Hereinafter, the agreement of Sept. 30, 1965, and its amendments of Oct. 24, 1967, and Nov. 22, 1969, will be referred to collectively as the agreement.)

In 1962, Vornado's then president was disabled as the result of a heart attack. He continued to perform the duties of chief executive officer while hospitalized and also while recuperating at home. Decedent was aware of the disability of his predecessor.

About 1975, the head of Vornado's Two Guys Food Division was disabled as the result of open heart surgery. He continued to perform as many of his duties as he could while recuperating from the operation.

In 1978, Vornado's assistant vice president in charge of merchandising for the food division broke her ankle and her wrist. During her disability, she continued to manage her department from her home.

It was the customary practice at Vornado that management employees, such as decedent, would continue to render services to the company during disability. No management employee of Vornado had ever become disabled to such an extent that Vornado had terminated the employee's employment.

In the event of disability, decedent was obligated to render services to the best of his ability for the remaining term of the agreement and was under a continuing obligation during the term of the agreement to resume performing services as soon as he recovered sufficiently to do so.

Upon decedent's death, his children became entitled, under the agreement, to monthly payments from Vornado in the same amounts and for the same period of time as decedent would have been entitled to had he survived until November 30, 1979, and remained in Vornado's employ until that date. The commuted value of the payments to which decedent's children became entitled was $811,362. The executors, in filing decedent's Federal estate tax return, specifically noted the agreement but excluded the commuted value of the payments from decedent's gross estate.

Vornado's stock is listed on the New York Stock Exchange. On April 21, 1971, it had 11,677 shareholders. As of January 30, 1972 (the date of Vornado's audited balance sheet nearest decedent's date of death), there were 6,137,480 shares of Vornado stock outstanding. On the date of his death, decedent owned 1,300 shares of stock of Vornado. On the date of his death, decedent owned 10 of the 105 outstanding shares of Jaunty Dress Shops, Inc., which in turn owned 228,825 shares of Vornado on this date. During his life, decedent was also beneficial owner of 72 shares of stock in Jaunty Dress Shops, Inc., which were held in trust. His interest in these shares terminated on his death under the terms of the trust. The trustees of this trust were decedent, Jennie Siegel, and Joseph Lipshie. Under the terms of the trust, the trustees had the power to vote shares of stock held by the trust.

## OPINION

The parties agree that the commuted value of the payments to which decedent's children became entitled under the agreement is $811,362.

Since the parties have focused most of their attention on the section 2039(a) issue, we will discuss this issue first.

## I. *Section 2039*

Respondent maintains that decedent had a right under the agreement to receive disability payments which are postemployment benefits, resulting in the value of the payments to decedent's children being includable in decedent's gross estate under section 2039(a). Petitioner asserts that the agreement provides only for salary or wage continuation payments, which are not includable under section 2039(a). We agree with petitioner.

Section 2039(a)[3] was a new provision enacted in 1954 (Pub. L. 83–591, 68A Stat. 384) in order to clarify the estate tax treatment of joint and survivor annuities purchased in whole or in part by a decedent's employer. See H. Rept. 83–1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 90–91 (1954); S. Rept. 83–1622, to accompany H.R. 8300 (Pub. L. 591); 83d Cong., 2d Sess. 123–124 (1954); H. Conf. Rept. 83–2543, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 74 (1954). However, the language of the provision clearly is broader than the joint and survivor annuity situation. *Bahen's Estate v. United States*, 158 Ct. Cl. 141, 305 F.2d 827 (1962); *Estate of Beal v. Commissioner*, 47 T.C. 269, 271–272 (1966). See H. Rept. 83–1337, *supra* at A314–A316; S. Rept. 83–1622, *supra* at 469–472.

The parties agree that the following requirements for inclusion in decedent's gross estate under section 2039(a) have been met:

(1) The benefits are receivable pursuant to a form of contract or agreement (other than insurance on decedent's life) entered into after March 3, 1931;

---

[3]SEC 2039. ANNUITIES.

(a) GENERAL.—The gross estate shall include the value of an annuity or other payment receivable by any beneficiary by reason of surviving the decedent under any form of contract or agreement entered into after March 3, 1931 (other than as insurance under policies on the life of the decedent), if, under such contract or agreement, an annuity or other payment was payable to the decedent, or the decedent possessed the right to receive such annuity or payment, either alone or in conjunction with another for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death.

(2) The beneficiaries are entitled to receive the benefits by reason of surviving decedent; and

(3) Decedent had the right to receive payments under the contract or agreement for a period which did not in fact end before decedent's death.

The parties' dispute is as to whether decedent, at the time of his death, had the right to receive an "annuity or other payment," within the meaning of section 2039(a). If the agreement did not provide for an "annuity or other payment" to decedent, then section 2039(a) does not require the inclusion of the value of the payments in decedent's gross estate.

It is well established that the term "annuity or other payment" within the meaning of section 2039 does not include regular salary payments (*Kramer v. United States*, 186 Ct. Cl. 684, 406 F.2d 1363, 1366 (1969); *Estate of Fusz v. Commissioner*, 46 T.C. 214, 217–218 (1966)) or payments under wage continuation plans (see *Estate of Schelberg v. Commissioner*, 70 T.C. 690, 702 (1978), revd. 612 F.2d 25, 29 (2d Cir. 1979); see also materials cited in Rev. Rul. 77–183, 1977–1 C.B. 274, 275). The phrase "other payment" is qualitatively limited to postemployment benefits. *Estate of Fusz v. Commissioner*, 46 T.C. at 218. It is not necessary, however, that the decedent actually be receiving the postemployment benefits at the time of death. If at that time, even while yet employed and receiving only a salary, the decedent possessed the right to receive postemployment benefits at some time in the future, then the statutory requirement regarding the decedent's right to an "annuity or other payment" is met. It is immaterial that death prevents the decedent's receipt of the postemployment benefits. *Gray v. United States*, 410 F.2d 1094, 1110–1111 (3d Cir. 1969); *Bahen's Estate v. United States, supra; Estate of Wadewitz v. Commissioner*, 39 T.C. 925, 936–938 (1963), affd. 339 F.2d 980 (7th Cir. 1964). See *Kramer v. United States*, 406 F.2d at 1366–1367.

In the instant case, the following factors suggest that the agreement provided for postemployment benefits to decedent:

(1) The agreement stated as one of its purposes (third "Whereas"), the monetary provision for decedent in the event of his disability.

(2) The agreement provided for payments to decedent after "his employment is duly terminated because of disability." (Fourth (a)(i).)

The following factors suggest that the agreement did not provide for postemployment benefits to decedent:

(1) The agreement contemplated a continuing obligation on decedent's part to work for Vornado for the term of the agreement, over which term payments at the regular salary rate were to be made (Second).

(2) Decedent was to serve to the best of his ability on the same terms and conditions as were in effect before the agreement was signed (Third). It was the customary practice at Vornado that management employees, such as decedent, would continue to render services to the company during periods of disability.

(3) No employee of Vornado had ever become disabled to such an extent that Vornado had terminated the employee's employment.

(4) In the highly unlikely event that decedent's employment would have been terminated during the term of the agreement because of disability, with decedent still receiving payments, decedent would have had a continuing obligation to return to work when he became able to render services.

There is no reason in the record to conclude that the agreement contemplated that the services to be rendered in the event of disability would be nominal or pro forma. There is no reason in the record to conclude that the prescribed payments were really a retirement annuity;[4] in fact, decedent would have been only 65 years old at the end of the term of the agreement.[5] We conclude that if disability payments would have been made under the agreement, then they would have constituted wages for services rendered or payments in lieu of wages during a period of absence from work because of sickness or other incapacity following which decedent would have been expected to return to work. We conclude that the agreement did not provide for postemployment benefits to decedent.

Contrary to respondent's analysis, this conclusion does not

---

[4] See examples concerning retirement annuities in sec. 20.2039–1(b)(2), Estate Tax Regs.

[5] In *Kramer v. United States*, 186 Ct. Cl. 684, 406 F.2d 1363 (1969), the Court of Claims concluded that the record did not show any intention to provide for postemployment benefits where the contract stated that "In the event of illness and/or in the event that due to any circumstances which may make it impossible for Mr. Kramer to continue to act as General Manager, the Company agrees that he shall remain with it as an Advisor and Counsellor * * * *for the remainder of his life*" at the same salary as he was to receive as General Manager. 406 F.2d at 1364–1365. Emphasis supplied.

read the disability language out of the agreement. This conclusion merely means that disability would have excused decedent from performing services only to the extent of, and for the time of, the disability.

In arriving at the foregoing conclusions, we have taken into account testimony as to the meaning of the agreement. At trial, we reserved decision on respondent's objections to receipt of this testimony, based on the parol evidence rule. Petitioner maintains that the agreement was not an integrated contract, and so parol evidence is not barred. Respondent relies on *Commissioner v. Danielson*, 378 F.2d 771, 775 (3d Cir. 1967), revg. 44 T.C. 549 (1965), and *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), to prevent the taking of parol evidence. We agree with petitioner.

The parol evidence rule is properly a rule of substantive law, and not one of evidence. *Estate of Craft v. Commissioner*, 68 T.C. 249, 262–263 (1977), affd. per curiam 608 F.2d 240 (5th Cir. 1979). It requires exclusion of evidence which is offered to vary or contradict the terms of an integrated contract; it does not require exclusion of evidence offered to interpret such terms. So we understand the rule. E.g., *Mitchell v. Commissioner*, 65 T.C. 1099, 1107 (1976), affd. 590 F.2d 312 (9th Cir. 1979). So the courts of New Jersey understand the rule.[6]

In the instant case, we confront the agreement, which

---

[6]The Supreme Court of New Jersey summarized its view of the rule as follows in *Atlantic Northern Airlines v. Schwimmer*, 12 N.J. 293, 301–302, 96 A.2d 652, 656 (1953):

"Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity. The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded. The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance. Such evidence is adducible only for the purpose of interpreting the writing—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said. So far as the evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant. The judicial interpretive function is to consider what was written in the context of the circumstances under which it was written, and accord to the language a rational meaning in keeping with the expressed general purpose. Casriel v. King, 2 N.J. 45, 65 A.2d 514 (1949)."

To the same effect, see, e.g., *Terminal Construction Corp. v. Bergen County, Etc.*, 18 N.J. 294, 113 A.2d 787, 803–804 (1955); *Harker v. McKissock*, 12 N.J. 310, 96 A.2d 660, 666 (1953); *Garden State Plaza Corp. v. S.S. Kresge Co.*, 78 N.J. Super. 485, 189 A.2d 448, 454–456 (N.J. Super. Ct. 1959); *Varriano v. Miller*, 58 N.J. Super. 511, 156 A.2d 720, 724 (N.J. Super. Ct. 1959).

provides (at paragraph Third), "Siegel agrees to serve the Corporation faithfully and to the best of his ability, and to continue to serve the Corporation on the same terms and conditions as have heretofore been in effect." The agreement does not describe these "same terms and conditions." The agreement provides (at paragraph Fourth (a)(i)) for payments to be made if decedent's "employment is duly terminated because of disability." The agreement neither defines nor spells out procedures for determining "disability," nor does it explain what is meant by "employment is duly terminated."

Clearly, the parol evidence rule does not require the exclusion of testimony which tends to explain the agreement's reference to "the same terms and conditions as have heretofore been in effect" and the meanings intended by the terms "disability" and "employment is duly terminated." The cited New Jersey cases (n. 6 *supra*) indicate that such evidence would be admissible for the purpose of explaining the agreement as between the parties to the agreement. We see no conflict between this analysis and that set forth by the Court of Appeals for the Third Circuit in *Commissioner v. Danielson, supra* (e.g., *Mitchell v. Commissioner*, 65 T.C. at 1107), and so, we see no occasion to consider the application of the so-called *"Golsen rule"* to this matter.

Accordingly, respondent's objection is overruled and the testimony is received into evidence.

In *Estate of Schelberg v. Commissioner, supra*, Schelberg was entitled to participate in each of four separate plans of his employer. The life insurance plan provided for survivors' income benefits to eligible survivors; the value of Schelberg's survivors' income benefits under this plan was sought to be included in Schelberg's gross estate. Under the retirement plan, Schelberg would have been required to retire at age 65 and would have been entitled at that time to retirement benefits. Under the sickness and accident plan, Schelberg was entitled to receive full salary while absent from work on account of sickness or accident for up to 52 weeks in any 24-month period; benefits could be continued under this plan for more than 52 weeks at the employer's discretion in individual cases. Under the disability plan, Schelberg would be entitled to benefits if a special corporate panel determined he was totally and permanently disabled; the payments under this plan would begin on the expiration of the 52-week period of sickness and accident

benefits (plus any period of individual consideration benefits under the sickness and accident plan) and continue until normal retirement date, at which time, Schelberg would become eligible for benefits under the retirement plan. Schelberg died while an active, full-time employee. This Court held that the potential benefits under the disability plan were postemployment benefits rather than wage continuation payments. We found strong considerations linking the disability plan to the retirement plan, and we thought it was critical that the disability plan assured a participating employee of income during a period of disablement notwithstanding that the employee was never expected to render any services. 70 T.C. at 701–702.

The Court of Appeals for the Second Circuit reversed, concluding that Schelberg's rights under the disability plan were too dissimilar in nature from an "annuity or other payment" and too contingent to meet the conditions of section 2039(a). 612 F.2d at 29. The Court of Appeals also viewed benefits under the disability plan as a partial continuation of wages when an employee's physical health deteriorated even further than that justifying benefits under the sickness and accident plan. 612 F.2d at 31. The Court of Appeals stated that we should not have presupposed a postretirement status from the disability benefits. 612 F.2d at 31.

Schelberg had a right to disability benefits only if he were determined to be totally and permanently disabled. If that determination were made, then Schelberg would have had no obligation to return to work if he became able. Schelberg would have had a right to disability payments with no continuing obligation to his employer once the corporate panel determined his total and permanent disability.

In contrast to *Schelberg*, as we interpret the agreement, decedent had no right to disability benefits freed from an obligation to perform services "to the best of his ability."

In analyzing the agreement, we recognize that it is conceivable that decedent might become so disabled during the term of the agreement that he would be completely unable to render any services, and that Vornado might be so convinced of the permanence of the condition that it would never expect any future services from him. This situation may be what was contemplated by the reference in paragraph Fourth (a) to termination of employment. Also, the situation could theoreti-

cally arise in which Vornado would not only terminate decedent's employment as a result of a determination that he was totally and permanently disabled but would completely release decedent from any continuing obligation to return to work if he became capable of doing so. We do not believe that this was contemplated by the agreement, however. We see no reason why Vornado would gratuitously release the decedent from a continuing obligation to return to work. Certainly, the agreement does not clearly entitle decedent to such treatment in the event of his total and permanent disability. Considering all these factors, we conclude that the disability payments were intended to be salary or a wage continuation program in the event of sickness or disability. The agreement assured decedent of income during a period of disablement only if he rendered services which he was capable of, or resumed performing services if and when he recovered from a disability so serious as to preclude the rendering of services.

Since we find the nature of the payments in the instant case to be distinguishable from those in *Estate of Schelberg,* we do not need to reconsider, at this time, our holding in that case in light of the reversal by the Court of Appeals for the Second Circuit.

Respondent relies on *Bahen's Estate v. United States, supra,* contending that if decedent had become totally incapacitated, he would have been entitled to disability payments similar to those which resulted in the inclusion in Bahen's estate.

Bahen's employer agreed to pay a stated sum ($100,000 in Bahen's case) in 60 monthly installments to the widow or minor children of any designated officer, beginning at the time of the officer's death, whether the officer died before or after retirement. The plan also provided that if the officer became totally incapacitated before retirement, the monthly payments were to be made to him or her, with any installments unpaid at death to be made to the surviving spouse or children. Bahen, a designated officer, died before becoming eligible for retirement and without ever becoming incapacitated. The Court of Claims held that Bahen's right to the disability benefits was a right to an "other payment" within the meaning of section 2039, such that the commuted value of the benefits to be paid to the widow were includable to Bahen's gross estate.

In *Bahen's Estate,* as in *Estate of Schelberg,* the disability benefit was to be paid only if the employee was totally

incapacitated for further performance of duty. 305 F.2d at 828. In the instant case, we have concluded, payments continued during disability but only with the employee's continuing obligation to perform services to the best of his or her ability and to return to regular duties when able to do so.

We conclude that *Bahen's Estate* is distinguishable from the instant case.

Respondent seeks to distinguish *Kramer v. United States, supra,* on the ground that in that case, the contracted-for payments were stipulated to be salary, while in the instant case, the contracted-for payments are in lieu of salary. The label to be given the payments is not as important as what the payments would have been for. In *Kramer*, the Court ruled that Kramer would have been obligated to provide the specified advice and counsel; in the instant case, we have concluded that decedent would have been obligated to provide services to the best of his ability. In *Kramer*, the payments were to continue for Kramer's life; in the instant case, the payments were to end when decedent would have reached age 65. On balance, the instant case is the stronger for the conclusion that the payments were not postemployment benefits.

On this issue we hold for petitioner.

## II. *Section 2038*

Respondent asserts that decedent transferred property and retained a power to alter, amend, revoke, or terminate the enjoyment of the transferred property. This, respondent maintains, results in the value of the payments to decedent's children being includable in decedent's gross estate under section 2038(a)(1). Petitioner does not dispute that there was a transfer (see *Estate of Tully v. United States*, 208 Ct. Cl. 596, 528 F.2d 1401, 1404 (1976); *Kramer v. United States*, 406 F.2d at 1369), but contends that the agreement's reference to modification "by the mutual consent" of decedent and Vornado adds nothing to the basic contract law rights of parties to renegotiate their contract. This, petitioner asserts, is not the sort of reserved power contemplated by the statute. Respondent answers that the cases upon which petitioner relies are irrelevant because the

contracts there involved contained no express language as to rights to renegotiate,[7] while the agreement authorized decedent, with Vornado's assent, to modify the rights or interests transferred to his children.

We agree with respondent.

Under section 2038(a)(1),[8] the value of the payments to decedent's children are includable in decedent's gross estate if decedent retained a power to alter, amend, revoke, or terminate the right to these payments, either alone or in conjunction with any other person.

Paragraph Fifth of the agreement provides: "No right or interest is hereby granted to the children of Siegel except as set forth herein and such rights or interests are subject to any modification of this agreement by the mutual consent of Siegel and the Corporation." Thus, decedent reserved the power in conjunction with Vornado to modify the rights of the beneficiaries by a subsequent agreement.[9] On its face, the agreement provides for the very power in decedent that results in inclusion under section 2038(a)(1).

Petitioner relies on *Estate of Tully v. United States, supra,* and *Kramer v. United States, supra,* for the proposition that "the ability of parties to a contract to agree to amend its terms is insufficient to satisfy the requirements of Code Section 2038."

---

[7]Those cases, respondent maintains, involved respondent's assertion that the employee's indirect control over the corporate employer amounted to a "power" sufficient to require inclusion in the gross estate. Respondent apparently eschews such an argument in the instant case.

[8]SEC. 2038. REVOCABLE TRANSFERS.

(a) IN GENERAL.—The value of the gross estate shall include the value of all property—

(1) TRANSFERS AFTER JUNE 22, 1936.—To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished in contemplation of decedent's death.

The amendment of this provision by sec. 2001(c)(1)(K)(i) of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1852, to conform to the revision of the "contemplation of death" rule, does not affect the instant case.

[9]In the amici brief filed on behalf of Arlene Siegel and Robert Siegel, it is asserted that paragraph Fifth contemplates only a reserved power to change salary and term of employment, not to change beneficial enjoyment. The record does not justify so narrow a reading of the agreement.

Petitioner acknowledges that Kramer did not reserve a right to renegotiate the amount of payments. In *Tully*, also, there was no express reservation of such a power. Petitioner maintains that *Tully* and *Kramer* are nevertheless on point because, "It is basic contract law that the parties to a contract may, at any time, renegotiate the terms of their contract. Vol. 6, Corbin on Contracts, § 1293 (1962). Thus the language contained in Article Fifth adds nothing to the rights that parties to contracts always possess." Petitioner draws comfort from an estate tax regulation (which we gather to be sec. 20.2038–1(a)(2)[10] ), contending that the regulation recognizes that a power which exists under local law is not includable under section 2038(a)(1). Petitioner concludes that an identical power specified in the agreement also is not includable under section 2038(a)(1).

First, in fact no power was reserved by the agreements involved in *Tully* and *Kramer*. The issue in these cases was whether Tully's ownership of 50 percent of his employer's stock, or the "love and affection" for Kramer by the board of directors of Kramer's employer, caused Tully or Kramer to have a section 2038(a)(1) power. The Court of Claims held in each of these cases that that was not enough in the absence of a power reserved in an agreement. *Estate of Tully v. United States*, 528 F.2d at 1404; *Kramer v. United States*, 406 F.2d at 1369. It is precisely the element that the Court of Claims found to be missing in *Tully* and *Kramer* that the parties acknowledge is present in the instant case.

Secondly, as petitioner acknowledges, section 20.2038–1(a)(2), Estate Tax Regs., does not apply to the instant case, since the contingent beneficiaries were excluded by the agreement from any voice in revising their rights under the agreement. The cited regulation embodies the approach of the Supreme Court in

---

[10]The regulation provides, in pertinent part, as follows:

Sec. 20.2038–1 Revocable transfers.

(a) *In general.* A decedent's gross estate includes under section 2038 the value of any interest in property transferred by the decedent, whether in trust or otherwise, if the enjoyment of the interest was subject at the date of the decedent's death to any change through the exercise of a power by the decedent to alter, amend, revoke, or terminate, or if the decedent relinquished such a power in contemplation of death. However, section 2038 does not apply—

\* \* \* \* \* \* \*

(2) If the decedent's power could be exercised only with the consent of all parties having an interest (vested or contingent) in the transferred property, and if the power adds nothing to the rights of the parties under local law; \* \* \*

*Helvering v. Helmholz*, 296 U.S. 93 (1935). *Hauptfuhrer's Estate v. Commissioner*, 195 F.2d 548, 551 (3d Cir. 1952). It was precisely the exclusion of contingent beneficiaries in *Houghteling v. Commissioner*, 40 B.T.A. 508 (1939), that caused us to distinguish *Houghteling* from *Helmholz*. As a result of that distinction, we held in *Houghteling* that there was a power which required inclusion in the gross estate under section 302(d) of the Revenue Act of 1926, a predecessor of section 2038(a)(2). We concluded that, under the relevant State law, the contingent beneficiaries had rights which were being cut off, and so the *Helmholz* doctrine did not apply. 40 B.T.A. at 513–514. See 3 J. Mertens, Law of Federal Gift & Estate Taxation, sec. 25.20, p. 663 (1959). See also *Estate of Casey v. Commissioner*, 55 T.C. 737 (1971); *Estate of Davis v. Commissioner*, 51 T.C. 361 (1968), in both of which we held that a trustor's power to revoke was sufficient to require inclusion under section 2038(a)(1), even though no power was expressly reserved by the trustor and the power that existed arose solely from operation of State law.

` Thirdly, decedent and Vornado apparently did not trust the cited "basic contract law" to produce the results they desired and concluded that it was necessary or desirable to specify their power to vary the rights of decedent's children, and to exclude the children from the class of persons entitled to modify these rights. In contrast to the section 2039(a) dispute, *supra*, we have no evidence as to the meaning or purpose of paragraph Fifth of the agreement that might cast a different light on the matter.

Fourthly, neither side in the instant case has favored us with an analysis of New Jersey law bearing on the matter.

It is well-recognized that third-party beneficiaries, including third-party donee beneficiaries, have enforceable rights under New Jersey law in contracts made for their benefit. N.J. Stat. Ann. sec. 2A:15–2 (West 1952);[11] *Estate of Lingle*, 72 N.J. 87, 367 A.2d 878, 882 (1976). See *Drewen v. Bank of Manhattan Co. of City of New York*, 31 N.J. 110, 155 A.2d 529, 532–533, 534 (1959); 4 A. Corbin, Contracts, sec. 774, p. 6 (1951); 2 S. Williston, Contracts, secs. 356–357, pp. 823, 828, 849 (3d ed. 1959). We are

---

[11]2A:15–2. Beneficiary in contract suing or defending

A person for whose benefit a contract is made, either simple or sealed, may sue thereon in any court and may use such contract as a matter of defense in an action against him although the consideration of the contract did not move from him.

thus faced with the question of what power Vornado and decedent as promisor and promisee would have had to extinguish or modify the rights of the named beneficiaries in the absence of an express reserved power to modify the rights.

Under section 142 of the First Restatement of the Law of Contracts, the duty of the promisor to a donee beneficiary cannot be released by the promisee or affected by any agreement between the promisee and promisor unless the power to discharge or modify the contract is expressly reserved in specific terms. 4 A. Corbin, Contracts, secs. 813–814, pp. 244–255 (1951); 2 S. Williston, Contracts, sec. 396, pp. 1067–1070 (3d ed. 1959). Thus, the general rule is that a third-party donee beneficiary acquires a right immediately upon the making of a contract intended for his benefit, and that right becomes immediately indefeasible unless the contract reserves the right to change the beneficiary or modify the rights of the beneficiary.

Section 142 of the Second Restatement of Contracts (Tent. Draft No. 1–7, 1973), pp. 307–313, provides a rule whereby a third-party beneficiary's rights are much more limited. Under the rule of the Second Restatement, a promisor and promisee may, by agreement, create a right in the third-party beneficiary which cannot be discharged or modified by a subsequent agreement between the promisor and promisee. In the absence of such a term, the promisor and promisee retain the power to discharge or modify the contract by subsequent amendment until the beneficiary materially changes his or her position in justifiable reliance on the promise, or brings suit on it, or manifests assent to it in a manner invited or required by the promisor or promisee. Petitioner has presented no authority indicating that New Jersey courts have adopted the rule described in the Second Restatement; nor have we found any. However, whichever rule is applied, we conclude that by expressly reserving the right to modify the rights of the beneficiaries, decedent and Vornado had greater rights than their rights under local law. Under the rule of the First Restatement, decedent and Vornado would not have been able to modify the rights of the beneficiaries without their consent in the absence of an expressly reserved power to do so. Under the rule of the Second Restatement, decedent's and Vornado's power to modify could have been terminated by specified actions by the beneficiaries in the absence of an expressly reserved power.

Decedent, in the instant case, retained a power in conjunction with Vornado to modify the rights of the beneficiaries. This power could be exercised by decedent and Vornado without the consent of the beneficiaries; the language of the agreement having foreclosed the beneficiaries from taking steps (under the approach of the Second Restatement) to vest their rights as third-party beneficiaries. The power thus retained appears to be greater than the rights of the parties under local law.

In sum, by joining in the reservation of power set forth in paragraph Fifth of the agreement, decedent retained strings which appear to be greater than those arising from local contract law. The retention of such strings leads to inclusion under section 2038(a)(1).

On this issue, we hold for respondent.

Because of remaining issues, an order will be issued reflecting decision on this issue, and the case continued to the general docket.

*An appropriate order will be issued.*