LILLIAN CASRIEL ET AL., COMPLAINANTS-RESPONDENTS,
v. LILA W. KING, DEFENDANT-APPELLANT.

Argued March 7, 1949—Decided April 4, 1949.

*Mr. Milton M. Unger* argued the cause for the appellant (*Mr. Adrian M. Unger,* on the brief).

*Mr. Ward Kremer* argued the cause for the respondents.

The opinion of the court was delivered by
.HEHER, J.   The challenged decree grants to the vendors specific performance of a contract made February 1, 1947, for the sale of lands and a hotel building situate on the north side of Third Avenue, east of Bergh Street, in Asbury Park (the second block from the beach front) ; and the vendee appeals pursuant to Article XI, section IV, paragraph 8 of the Constitution of 1947, and chapter 367 of the Pamphlet Laws of 1948.

The contract is not set out in full in the appendix.   As revealed by the excerpts taken therefrom, it does not provide in terms for a conveyance of the lands free from all encumbrances except those specified, but merely for a conveyance "subject to covenants, conditions and restrictions of record, which have not been violated;" and subject also "to state and municipal laws and requirements as to the use, location and constructions of the building and premises, which have not

been violated," and "to such state of facts as may be disclosed by an accurate survey, provided said survey indicates that the buildings are all within the boundary lines."

The primary question for decision is the meaning of the first of the foregoing clauses. The vendee refused performance ostensibly upon the ground that the title was encumbered by "covenants, conditions and restrictions of record which have been violated contrary to the provisions" of the contract in suit.

The building housed the "Asbury Ambassador Hotel." Since April, 1944, the hotel management had sold intoxicating liquors at a bar maintained for the purpose on the first floor of the building under a retail liquor consumption license issued to the operating corporation; and the contract obligated·both the vendors and the vendee to do all that was necessary to effect a transfer of the liquor license to the vendee. The transfer of the license was expressly declared to be "of the essence" of the agreement; and it was provided that if the transfer be refused, the contract "shall be null and void" and the payments made thereunder by the vendee shall be refunded, and that "the closing of title shall not take place until the transfer of the license is approved by the appropriate municipal authorities." The vendee also undertook to purchase, at cost, "all alcoholic beverages and other merchandise used in connection with the operation of the bar." And it was agreed that the operation of the hotel should continue until the passing of title.

A covenant against the sale of intoxicating liquors on the lands is cited in justification of the refusal of performance.

On November 16, 1875, James A. Bradley, the founder of Asbury Park, conveyed the lands to one Atkins subject to a covenant real barring their use for the sale of intoxicating liquors on pain of a reverter. With some few exceptions, a like restrictive covenant was incorporated in the deeds conveying all the remaining lands in Asbury Park east of the railroad, made by Bradley before and after the deed to Atkins. On January 7, 1944, the substitutionary administrator c. t. a. and trustee under the will of the deceased Bradley quitclaimed

the lands in suit to the then holder of the record title, freed of all right of entry and reversion for condition broken "or for or by reason of any violation" of the cited covenant or condition, in consideration of a covenant to run with the land made by the grantee against the sale of intoxicating liquor on the premises, provided that if the original restriction had been "abandoned by nonobservance, by change in the character of the neighborhood, by agreement, or otherwise," nothing therein contained would serve to revive the obligation or restriction so abandoned, and the new covenant therein "in respect to the restriction * * * shall be for nothing holden."

The insistence is that the clause cited *supra* constituted "a warranty that, in fact, there had been no violations of covenants, conditions and restrictions of record;" and that "the phrase 'have not been violated'" was not "intended to mean otherwise than that" the vendors "were required, and had warranted, to convey a title unencumbered by covenants, conditions and restrictions of record which had been violated." The learned Vice-Chancellor suggested that this phrase should be construed to read "which have not *already* been violated." Although of the view that the clause "was never intended as a warranty that the liquor restriction had not been violated," he concluded that "if it was so intended by the vendee, she must be held to have waived it." And he also found "an estoppel against any possible right of rescission," and an "abandonment" of the covenant.

As we have seen, the agreement of sale does not expressly provide for a conveyance of the lands free from all encumbrances except those specified. True, in every contract for the sale of lands, an agreement is implied to make good title, barring an expression *contra*. But the ruling consideration is the intention of the parties. The vendee may undertake to run the risk of an apparent or known deficiency of title, or he may agree to take such title as the vendor is able to give. *Lounsbery v. Locander*, 25 N. J. Eq. 554 (*E. & A.* 1874). As in the case of contracts generally, we seek for the intention of the parties.

Were it not for the use of the separative comma, the phrase "which have not been violated" would clearly be restrictive of the class, serving to qualify and limit the antecedent group to include only those covenants and conditions which had not then been violated, rather than constitute a warranty that there had been no violation of any of the covenants, conditions, or restrictions of record. Does the comma render the whole sentence merely declaratory of the continued subsistence, unviolated, of all covenants, conditions, and restrictions of record? We are clear that it does not.

Punctuation marks are rarely, if ever, an infallible token of intention, for punctuation is to a large degree arbitrary and very often a matter of individual taste unrelated to the expression of the intention, and the comma is frequently employed merely to indicate rhetorical pauses and interruptions in continuity of thought and sometimes with an eye to structure without regard to precision in the delineation of the common purpose. Although not to be entirely ignored, punctuation cannot be allowed to control the meaning of the words chosen to voice the intention. The polestar of construction is the intention of the parties to the contract as disclosed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are to be regarded. Even when the contract on its face is free from ambiguity, evidence of the situation of the parties and the surrounding circumstances and conditions is admissible in aid of interpretation. The inquiry is the meaning of the words when assayed by the standard adopted by the law. On the theory that all language will bear some different meanings, evidence of the circumstances is always admissible in the construction of integrated agreements, but not for the purpose of giving effect to an intent at variance with any meaning that can be attached to the words. This is a primary rule of interpretation which has special application where the meaning of the instrument is not clearly apparent. The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to

secure light by which to measure its actual significance. Such evidence is adducible only for the purpose of interpreting the writing—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said. So far as the evidence tends to show not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant. And the general design of the agreement is to be kept in view in ascertaining the sense of particular terms. *Corn Exchange National Bank & Trust Co. v. Taubel,* 113 *N. J. L.* 605 (*E. & A.* 1934); *New York Sash & Door Co., Inc., v. National House and Farms Association, Inc.,* 131 *N. J. L.* 466 (*E. & A.* 1944); *Mantell v. International Plastic Harmonica Corp.,* 141 *N. J. Eq.* 379 (*E. & A.* 1947). In short, we are to consider what was written in the light of the circumstances under which it was written, and give to the language a rational meaning consistent with the expressed general purpose.

Viewing the words used here in the setting of the circumstances there can be no doubt, not even the slightest, that the parties deemed the covenant barring the use of the premises for the sale of intoxicating liquor as abandoned by reason of its open and continued violation for a period of nearly three years when the contract in suit was made, and the vendee thereby intended to assume the risk of that restriction and stipulated for such title as the vendors could give in that regard. Such is the fair meaning of the words appraised in the light of the circumstances and the conditions.

▆▆▆ The right to enforce a restrictive covenant may be lost by waiver or acquiescence. Actual or passive acquiescence may bar enforcement as contrary to equity and good conscience. *Sanford v. Keer,* 80 *N. J. Eq.* 240 (*E. & A.* 1912); *Ocean City Association v. Chalfant,* 65 *N. J. Eq.* 156 (*Ch.* 1903). "Quiescence will be a bar when good faith requires vigilance." *Stewart v. Finkelstone,* 1910, 206 *Mass.* 28, 92 *N. E.* 37.

▆▆ ▆▆ The vendee knew, at the time of the making of the contract, of the use of the premises for the sale of intoxicating liquors. She bargained for the transfer of the license

to continue such use; that was a condition precedent to the consummation of the sale. Was she then also aware of the record covenant against the sale of intoxicating liquors? The Vice-Chancellor found that she was; and we concur in that finding, especially because of the opportunity which was his to observe the witnesses and their manner and demeanor while testifying.

The agreement of sale was originally made November 16, 1946. The title to the lands then resided in a corporation which was owned and controlled by the vendors; and it was deemed advantageous to dissolve the corporation and to vest the title in the vendors individually before the consummation of the sale. Hence, the contract of February 1, 1947, which in its essence did not deviate from the terms of the earlier agreement. There was testimony, accepted as wholly credible by the Vice-Chancellor, that upon the execution of the earlier contract, the vendee's attorney was provided with an abstract of the title which revealed the liquor restriction as well as all other covenants and conditions affecting the lands. This was denied by the vendee's attorney, but he admitted having possession of the abstract in the latter part of the ensuing January, prior to the execution and delivery of the second agreement whose enforcement has been decreed. And there was direct proof of actual knowledge of the record restriction. It was the subject of discussion between the attorneys of the parties before the first agreement was made. Knowing that the vendors had violated the restriction, the vendee entered into the contract in suit and paid an additional $5,000 on account of the purchase price, and thereafter joined in an application for the transfer of the license to her and, by her attorney, entered an appearance at the meeting of the local licensing authority at which the application was considered and successfully urged favorable action. Thereupon, performance was refused.

The vendee assumed the risk, whatever it was, of the violated record restriction against the sale of intoxicating liquors on the premises. This is the plain sense of the words as clarified by the circumstances. What was said is not a cove-

nant that the restriction had not been violated. It is utterly inconceivable that the vendee would bargain for the purchase of the hotel premises, conditioned upon the transfer of the license for the continued retail sale of intoxicating liquor (a privilege of great value in the operation of a hotel), and at the same time sitpulate for a warranty of the integrity of the very restriction that would bar such use. And no obligation was laid upon the vendors to clear the record title of the restriction, for that was not within their power, and known to be such, and the parties plainly bargained on that assumption. This is implicit in what was written when related to the circumstances. The clear import of the stipulation is that the vendee would not assume the apparent obligation of a record restriction deemed wholly inefficacious through the acquiescence of all parties in interest in its continued violation, and thereby revive it; but she would run the risk of the title in that regard. The intention is clear when we consider the general tenor and purpose of the contract in connection with the surrounding circumstances. The contrary view proceeds on the hypothesis that the parties entered into a contract they knew to be futile.

The decree is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, HEHER, WACHENFELD, BURLING and ACKERSON—6.

*For reversal*—None.