70 N.J. Super. 344 (1961)
175 A.2d 677
JOSEPH SPIOTTA, PLAINTIFF,
v.
HARVEY J.E. MILKON, JOHN R. KRAYCIR, WALTER H. JONES, WILLIAM SCIACCA, AND THE NATIONAL STATE BANK OF NEWARK, A BANKING CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided October 30, 1961.
*345 Mr. Benjamin Wasserman, attorney for plaintiff.
Mr. Walter H. Jones, attorney for individual defendants.
Messrs. Darby and McDonough (Mr. Robert F. Darby, appearing), attorneys for defendant National State Bank of Newark.
PINDAR, J.S.C.
Plaintiff, Joseph Spiotta, seeks specific performance of an escrow agreement as the successful bidder for 28,000 shares of stock of the City National Bank and *346 Trust Company of Hackensack, New Jersey, together with the right to all dividends paid on same since the inception of this suit, against the defendant escrowee, National State Bank of Newark, and against the four other individual parties to the agreement, defendants Harvey J.E. Milkon, John R. Kraycir, Walter H. Jones and William Sciacca. Plaintiff also demands judgment against the four individual defendants for all future unjustifiable expenditures which they incur and which depreciates the value of the assets of the bank whose stock is in issue, as reflected by the balance sheet of August 1, 1959, but this claim involved only the matter of dividends.
The defendant Milkon counterclaims for specific performance, as successful purchaser of said stock, against the plaintiff and defendant escrowee bank, and in the alternative demands judgment rescinding the escrow agreement and declaring it to be a nullity.
Defendants Kraycir, Jones and Sciacca demand judgment declaring the escrow agreement to be in full force and effect until the expiration of its term and reserving unto these defendants the right to submit an offer or offers. In the alternative they demand that the defendant bank be ordered to deliver to the party that has made the highest offer to purchase, extant for more than 15 days, and to remit the proceeds to them in accordance with the agreement, or in the alternative to rescind the escrow agreement.
The defendant escrowee bank appears in this litigation as a stakeholder; it merely seeks judgment, fixing and determining the rights of the plaintiff and of the individual parties defendant to the 28,000 shares of stock in escrow, and stating the conditions precedent to the delivery of said stock to the party or parties specified in the judgment.
The individual parties to this action comprise the primary stockholders and officers of the City National Bank and Trust Company of Hackensack. They own 32,200 of the 40,000 shares outstanding, and the plaintiff owns the largest amount, namely 13,464. Friction developed among the plaintiff *347 and the individual defendants, and in order to dissolve their discordant relationship they entered into an escrow agreement dated November 7, 1958, which provided therein for automatic termination 18 months thereafter. Under this agreement the parties, in substantially the same proportion of their ownership of the total shares owned by all of the parties thereto, placed 28,000 shares in escrow for the purpose of seeking a buyer. As paragraph 3 of this agreement contains the provisions in dispute, it is set forth fully as follows:
"The 28,000 shares so held by the ESCROW BANK shall be sold as a unit by the ESCROW BANK to any responsible person bringing a bona fide offer to the bank provided the price tendered is not less than $37.50 for each share, including commission not to exceed $1.00 per share. The terms under which such sale shall be made shall specify at least 29 per centum of the gross purchase price as a down payment and payment in equal installment over a period of not more than the next two succeeding years with open prepayment privilege and with interest at least 4 1/2% on the unpaid balance. Upon receipt of the proceeds, or installments thereof, of such sale the ESCROW BANK shall remit to each party on a pro rata basis, deducting amounts due from such party on his stock. No delivery of said shares shall be made until the purchase price is paid in full to the ESCROW BANK. Any one or more of the parties shall have the right of first refusal to meet, within 15 days of such offer, any or every bona fide offer made for the stock. Any party or parties meeting such bona fide offer shall be entitled to a commission of $1.00 per share. A bona fide offer, whether coming from a party or from a stranger to this contract, for the purposes of this contract shall be an offer where a deposit of at least $25,000.00 in cash or certified check is paid to the ESCROW BANK."
This suit developed from the confusion arising by the bid of July 10, 1959 of one Charles M. Silverman, and the subsequent bids made by defendant Milkon and plaintiff Spiotta.
The time and sequence of these bids are not contested but as the various suggested interpretations of the agreement in relation to such bids are dependent upon the entire situation created by them, they are listed below for clarity:

*348
 Amount Approximate
 Date Person (Net[*]) Time
July 10, 1959 (Fri.) Silverman $36.50 Immaterial
July 24, 1959 (Fri.) Milkon 36.50 2:30 P.M.
July 24, 1959 (Fri.) Spiotta 37.50 4:00 P.M.
July 27, 1959 (Mon.) Milkon 37.60 2:30-2:55 P.M.
July 27, 1959 (Mon.) Spiotta 37.75 at 5 P.M.
July 27, 1959 (Mon.) Milkon 37.85 5:10 or 5:15 P.M.
Aug. 11, 1959 (Tues.) Spiotta 37.90 Immaterial
Aug. 26, 1959 (Wed.) Milkon 37.95 "
Sept. 9, 1959 (Wed.) Spiotta 38.00 "
Sept. 24, 1959 (Thurs.) Milkon 38.05 "
Sept. 25, 1959 (Fri.) Spiotta 38.10 "

Under the complaint filed August 28, 1959, and an affidavit of plaintiff, upon notice of motion, he sought preliminary restraint against all defendants from disposing of the described stock and that said escrowee not receive or accept, and that the individual defendants not deliver or submit to said escrowee, further offers to purchase shares of said stock until a determination of the contractual rights. This court granted such injunctive relief and a conformable order entered thereon is dated October 2, 1959, as of September 25, 1959. Plaintiff's application, by way of supplemental notice, to restrain payment of dividends during the pendency of this action, was denied since all of the directors of City National Bank are not named in the complaint and yet were indispensable parties to such demand.
Plaintiff contends affirmatively that, under the right of first refusal provision, his offer on July 24, 1959 of $37.50 was the highest bid by anyone within 15 days of the offer submitted by Silverman since the last day for the exercise of such right was Saturday, July 25, 1959, and therefore, under the terms of the agreement, he is entitled to purchase the shares in escrow. In the alternative, plaintiff contends that if the intervening Saturday and Sunday permitted resumption of bidding on Monday, July 27, then plaintiff's bid on that day of $37.75 was the highest one submitted. In this aspect plaintiff states that he explained to the escrowee, *349 on submitting his bids subsequent to his initial offer of July 24, that he considered the bidding to have terminated on Saturday, July 25, but submitted his bid to protect his interests because of the escrow bank's expressed interpretation that: (a) the 15-day period after Silverman's bid of July 10 ended on Monday, July 27, since the 15th and 16th days were Saturday and Sunday, bank holidays; and (b) the bank could accept any further bids if made by the parties to the escrow agreement within 15 days of each other. Plaintiff also claims that the counterclaim of rescission, asserted by the defendants in an amended answer pursuant to order of court granted at the pretrial conference, is inconsistent and contradictory to the defendants' initial counterclaim and consequently, the defendants, having once made their election of remedies, are precluded from asserting this additional remedy of rescission.
Defendant Milkon contends that his bid on Friday, July 24, was the highest offer within the 15-day period after the Silverman bid since July 25 was the last day and the close of banking business for the public on July 24 was 3 P.M., and therefore plaintiff's bid at 4 P.M. was too late. In addition, he contends that since the right of first refusal does not contemplate or give any right as between one party and another party to the escrow agreement, his bid on July 24, being the first offer after the Silverman bid, can be the only valid one under this provision. In the alternative defendant contends that Monday, July 27, was the last day of bidding, since Saturday and Sunday are banking holidays and that his bid at 5:10 P.M. was part of a continuous bidding procedure, and being the last bid within the aforesaid period, constitutes him as successful bidder, or that 3 P.M. was the closing hour for banking business and therefore his bid, submitted at 2:55 P.M., was the only valid one.
All individual defendants contend that the agreement should be rescinded, or at least specific performance denied to the plaintiff, on the joint or several grounds that the Silverman bid was not made by a responsible person, that *350 the plaintiff's nondisclosure that he had a private agreement with Silverman whereby he, plaintiff, would participate to the extent of a 50% interest in the purchase by Silverman, constituted fraud or at least unclean hands; that the escrow agreement, in particular the provision for a right of first refusal, is ambiguous, indefinite and the result of a mistake and therefore unenforceable.
The question of rescission of the agreement, which has caused extensive perplexity, is the initial issue to be considered by the court. The determination of whether Spiotta or Milkon was the successful bidder, or whether the escrowee's interpretation that bids are acceptable within 15 days of each prior bid, would be irrelevant under an unenforceable contract.
However, the court is first confronted with the vigorous contention by the plaintiff that, at least by this time, the defendants must be bound to have elected between the inconsistent and contradictory remedies asserted and therefore should be precluded from maintaining their claim for rescission. R.R. 4:8-5(b) provides that "a party may also state as many separate claims or defenses as he has regardless of consistency * * *."
In Dial Press, Inc., v. Phillips, 23 N.J. Super. 543, 548 (App. Div. 1952), the court stated, "Our Supreme Court has indicated that the rule [of election of remedies] is a harsh and largely obsolete one and one which should be `strictly confined within its reason and spirit.' [citation omitted]" The decisions, however, disapprove simultaneous reliance on diametrically opposed sets of facts, but the defendants here do not assert contradictory facts; they merely present various interpretations as to the effect of the escrow agreement and consequently claim their alternate rights under those respective interpretations. Under the facts of this case, mainly the imperspicuity existing by virtue of the ambiguous language of the agreement, it would indeed be contrary to substantial justice to insist that the defendants virtually sit as their own court to predetermine *351 which of their contentions this court may find to be meritorious. Accordingly, it is determined as a matter of law that defendants are not precluded from asserting the claim of rescission along with the claim of specific performance.
In approaching the question of rescission the court feels that the paramount issue is whether the escrow agreement is so incomplete, indefinite and uncertain in its terms that it must be declared a nudum pactum. The contra contentions were prodigiously asserted by opposing counsel, and the court has been aided by their conscientious and able oral arguments and written briefs. Succinctly stated, the determination hinges on the interpretation of the right of first refusal provision, to wit, can it be interpreted so as (1) to encompass a bidding situation, or (2) to give an absolute right to purchase the escrow shares by the party to the agreement who first exercised the right of first refusal. These two questions comprise the gamut of all credible interpretations of the agreement, and if they are determined in the negative, then the agreement must be rescinded since "`the law will not make a better contract for parties than they themselves have seen fit to enter into, or alter it for the benefit of one party and to the detriment of the other. The judicial function of a court of law is to enforce a contract as it is written.'" First National Bank, Fort Lee v. Burdett, 121 N.J. Eq. 277, 281 (E. & A. 1936), and quoted in Guaclides v. Krause, 67 N.J. Super. 348, 363 (App. Div. 1961).
The rules of interpretation of contracts were concisely stated by the court in Schnakenberg v. Gibraltar Savings and Loan Ass'n, 37 N.J. Super. 150, 155, 156 (App. Div. 1955):
"The principles of law pertaining to the construction of a contract as in the instant case are firmly and well established. * * * The situation of the parties, the attendant circumstances, and the objects they sought to attain are all necessarily to be considered by the trial court in its inquiry as to the intention of the parties. When the meaning of an integrated contract is ambiguous, the surrounding circumstances *352 may be introduced for the purpose of elucidation. New York Sash & Door Co., Inc. v. National House, &c., Inc., 131 N.J.L. 466 (E. & A. 1944). Even when the contract on its face is free from ambiguity, evidence of the situation of the parties and the surrounding circumstances and conditions is admissible in aid of interpretation.
`The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance. Such evidence is adducible only for the purpose of interpreting the writing  not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said.' Casriel v. King, 2 N.J. 45 (1949)."
The right of first refusal is most frequently associated with leasehold agreements. In such contracts the landlord, promisor, gives the tenant, promisee, a conditional option or a right of pre-emption if the landlord decides to lease the premises again. "A right of `first refusal' or a `first privilege to relet' is not absolute, but a conditional right which does not prevent the owner from occupying the premises for himself and applies only if he intends to rent to another." Schnakenberg v. Gibraltar Savings and Loan Ass'n, supra, 37 N.J. Super., at page 157.
In the instant case the parties to the escrow agreement collectively gave this right to any one of such parties, individually. This right of each party must be considered conditional, so as not to deprive any of the promisors of their property if they do not intend to relinquish it. It can only extend the privilege of pre-empting the offer of another to buy (or rent) the property. Under this interpretation, which is completely consistent with the intent of the parties as indicated by the circumstances surrounding the formulation and execution of the contract, and also the language of the contract instrument taken in its full context, it is considered that the right of first refusal was provided for, so that a sale of the shares in escrow could not be made without the unanimous approval of all parties to the agreement; for this reason each party was given "the right of first refusal to meet, within 15 days of such offer, any or every bona fide offer made for the stock." The 15-day *353 limitation was solely for the purpose of preventing procrastination by the parties, once an offer had been made. To allow a bidding situation under the terms of this agreement would necessarily require the court to formulate an arbitrary procedure to govern the parties. The words "bidding" or "bid" are never mentioned in the instrument, and any provision, even remotely approximating this interpretation, is blatantly absent therefrom; to so construe this proviso would be in defiance of the most imaginative conception of the intent of the parties.
Similarly, the first party to exercise the right of first refusal by meeting the offer is not thereby entitled to require the other parties to sell the shares in escrow to him. As stated in Wellmore Builders, Inc., v. Wannier, 49 N.J. Super. 456, 464 (App. Div. 1958):
"Plaintiff's claim that it had an outright option under its agreement of June 16, 1955 with the Wanniers is a misconception of existing law. That agreement gave them the privilege of first refusal, classified by the authorities as a right of preemption or preemptive right option. * * * There is a material difference between a conventional option and a right of preemption. An ordinary option gives the optionee the power to compel the owner of the property to sell it at a stipulated price, whether he be willing to part with ownership or not. On the other hand, a privilege of first refusal or preemption does not give the preemptioner the power to compel the owner to sell; it merely requires the owner, when and if he decides to sell, to offer the property first to the person entitled to the preemption, at the stipulated price, and the preemptioner may then elect whether he will buy. The preemptioner's right to a conveyance depends upon the grantor's either notifying him that he desires to sell or offering or contracting to sell the premises to a third party without first giving the preemptioner the opportunity to buy at the stated price. * * *" (Citations omitted)
Hence, the bid by Milkon on July 24, 1959 had the sole effect to deny the bid of Silverman. It did not grant Milkon any right to compel a sale and therefore it was not necessary that the right of first refusal be exercised again, against this bid in order to deny it.
*354 To conclude otherwise would, in effect, mean that every exercise of the right of first refusal also constituted a new offer by another person and therefore, unless met within 15 days by a party to the agreement, would be a binding contract of sale. Under this interpretation an absurd situation could be created whereby each party to the agreement could within 15 days alternately meet (not exceed) the previous offer of a party ad infinitum. This situation, in fact, was approximated by the plaintiff and defendants, which caused the court to grant an injunction against the submission of further offers.
Accordingly, it is determined that the escrow agreement was too indefinite and uncertain to control this essential element arising under the facts presented to the court. In view of the fact that the rights of any third parties have not intervened and also that the instrument provided for termination 18 months from November 7, 1958 the agreement is declared nudum pactum.
Counsel should present a form of judgment in conformity with these conclusions.
NOTES
[*] Commission excluded.