> **NOT FOR PUBLICATION WITHOUT THE**
> **APPROVAL OF THE APPELLATE DIVISION**
>
> This opinion shall not "constitute precedent or be binding upon any court."
> Although it is posted on the internet, this opinion is binding only on the
> parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1618-15T3

STOCKTON UNIVERSITY,

  Plaintiff-Respondent,

  v.

KK VENTURES — ATLANTIC CITY,
LLC,

  Defendant-Appellant.

_____

KK VENTURES — ATLANTIC CITY,
LLC,

  Plaintiff-Appellant,

  v.

STOCKTON UNIVERSITY,

  Defendant-Respondent.

_____

  Argued January 10, 2017 — Decided  March 9, 2017

  Before Judges Fisher, Ostrer and Leone.

  On appeal from the Superior Court of New
  Jersey, Chancery Division and Law Division,
  Atlantic County, Docket Nos. C-47-15 and L-
  1490-15.

  Stuart J. Moskovitz argued the cause for
  appellant.

Stephen Hankin argued the cause for respondent (Hankin, Sandman Palladino & Weintrob, attorneys; Mr. Hankin, on the brief).

PER CURIAM

On December 12, 2014, Stockton University purchased the former Showboat Casino and Hotel in Atlantic City from Caesars Entertainment Operating Company, Inc. with the hope of opening an Atlantic City "Island Campus." A 1988 restriction for the benefit of Trump Taj Mahal Associates and Trump Taj Mahal Realty Corp., however, required the property's use as a "first class hotel casino" until 2082, and another restriction, which Caesars recorded in November 2014, prohibited the property's use as a casino for ten years. According to Stockton University, Caesars had represented as an inducement that Trump expressed a willingness to discharge the 1988 restriction; when that inducement proved false, Stockton University's intentions were frustrated and its position became untenable. Consequently, on April 3, 2015, Stockton University (the seller) agreed to sell "no later than" ninety days later, the property to KK Ventures — Atlantic City, LLC (the purchaser) for $26,000,000; that contract lies at the heart of this litigation.

The contract unequivocally recognized and referred to the two conflicting restrictions. One provision recognized that the

property was sold "as is" and purchaser's decision to buy was "not based on any covenant, warranty, promise, agreement, guaranty or representation by seller . . . except to the extent expressly set forth in this agreement." Another provision contained purchaser's acknowledgement, review, and approval of the "pro forma title insurance policy," which referred to the Caesars and Trump restrictions as "permitted exceptions." Attached as an exhibit to the contract, in fact, was a proposed deed, which recited that title would be subject to the Caesars restriction and "all other covenants [and] restrictions . . . of record."[1] And yet another provision expressed purchaser's "confirm[ation]" and "aware[ness]" of both the Trump restriction and Trump's intentions to enforce that restriction, and the Caesars restriction, which "purport[s] to prohibit gaming and gambling" on the property; purchaser expressed its desire "to purchase the [p]roperty notwithstanding the risks attendant to such matters."

Seller did not expressly obligate itself to rid, or attempt to rid, the property of either or both restrictions. Regardless of whether seller commenced such litigation, the parties expressly agreed that the seller would assign to the purchaser "all legal

---

[1] Elsewhere in the contract, the seller represented and warranted that it was aware of no other lawsuits that would threaten or affect its ability to convey "other than potential claims arising in connection with" the Caesars and Trump restrictions.

claims, including but not limited to those claims that exist or may exist under the [documents creating the two restrictions]." Along those lines, the parties agreed that the seller could unilaterally terminate the contract depending upon its obtaining relief from one or both of the restrictions; in requiring that the closing was to occur on an agreed upon date no later than ninety days from April 3, 2015, i.e., July 2, 2015, the parties stipulated in section 4(a) that

> [s]eller may cancel this [a]greement by giving written notice to such effect to [p]urchaser at any time during such ninety[-]day period if, and only if, [s]eller is unable to resolve to [p]urchasers['] satisfaction title issues pertaining to the [Trump restriction] and [the Caesars restriction] whereupon the [e]scrow (with all interest earned thereon) shall be returned to [p]urchaser and the parties shall be released of all further obligations hereunder.

The rights conferred by this provision generate one of the first bones of contention in this appeal.

The dispute about the rights and obligations conferred by the contract arose when — three weeks after the contract was executed — the purchaser advised that it would not close unless seller obtained a discharge of both the Trump and Caesars restrictions. Seller made such attempts; it met with Trump and Caesars representatives to obtain releases and filed a proof of claim in Caesars' bankruptcy proceeding. Those efforts failed, and, to keep

viable the possibility that the transaction would close, seller advised the purchaser on April 28 or 29, 2015, that it was "waiv[ing] its [section 4(a)] right to cancel and [was] elect[ing] to proceed to closing."

On June 18, 2015, the purchaser again advised it would not close unless the seller obtained releases of both restrictions. Seller — still insisting it had no obligation to obtain the release of either restriction — recounted its efforts to secure releases and, when the purchaser refused to close on July 2, seller declared the contract terminated.

The day before, July 1, 2015, purchaser filed a complaint against the seller in the Law Division, seeking damages for unjust enrichment and a declaratory judgment that, among other things, seller could not unilaterally terminate the contract. On July 8, the seller moved to dismiss that suit and, on July 10, filed its own complaint in the Chancery Division and applied for injunctive relief. On July 13, the judge issued temporary restraints in the chancery action; he prohibited purchaser from filing a notice of lis pendens on the property or otherwise interfering with the seller's attempts to convey the property to another. The next day, the purchaser filed an answer and counterclaim, which reasserted the allegations contained in its Law Division complaint. The two suits were later consolidated.

On August 10, 2015, after hearing argument regarding the relief sought in both the order to show cause and the motion to dismiss, the judge issued a written opinion explaining his rationale for granting the seller's request for a judgment which: declared the contract terminated as of July 2, 2015; permanently enjoined the purchaser from interfering with a sale of the property; prohibited purchaser from filing a notice of lis pendens on the property; dismissed the purchaser's Law Division complaint; and awarded seller counsel fees in an amount to be determined.

On August 31, 2015, the purchaser requested that seller supply energy, as defined by the contract, to purchaser's neighboring property.[2] Seller immediately refused, asserting that the right to energy contained in the contract's section 4(a) only "survived termination . . . in the event . . . [the purchaser] made a request between [April 3, 2015] and ninety days thereafter[,]" i.e., July 2, 2015. On September 2, 2015, the purchaser moved for an order compelling seller to provide energy to Revel.

On November 23, 2015, the judge denied the motion to compel the providing of energy and granted seller $44,570.84 in counsel fees and costs.[3]

---

[2] Purchaser had previously obtained the failed Revel casino.

[3] Seller subsequently sold the property.

A-1618-15T3

Purchaser appeals the August 10 and November 23, 2015 orders, arguing:

> I. IT WAS ERROR FOR THE [TRIAL COURT] FIRST TO GRANT A TRO ALTERING THE STATUS QUO AND THEN GRANT THE MOTION TO DISMISS THE COMPLAINT, PERMITTING [SELLER] TO TERMINATE THE CONTRACT AND RESELL THE PROPERTY.
>
> > A. [Seller] was not entitled to injunctive relief.
> >
> > B. The motion for Judgment on the Pleadings should have been denied in that there was a prima facie case established by [Purchaser's] Complaint.
> >
> > C. [Seller] failed to meet the standards required for a motion for judgment on the pleadings.
> >
> > D. By rules of contract interpretation [Seller's] Motion should have been denied.
> >
> > E. [Purchaser's] Pleadings set forth a valid claim for unjust enrichment.
>
> II. IT WAS ERROR FOR THE [TRIAL COURT] TO DENY [PURCHASER'S] MOTION TO COMPEL ACCESS FOR PROVISIONS OF UTILITIES.
>
> III. IT WAS ERROR FOR THE [TRIAL COURT] TO GRANT [SELLER'S] ATTORNEYS FEES IN THE ABSENCE OF NECESSARY SUPPORT.

We find no merit in these arguments.

In disposing of these issues, which we slightly rephrase, we find no error: (1) in the judge's interpretation of the contract,

in his conclusions about the impact of the implied covenant of good faith and fair dealing, and in his construction of the parties' contractual rights and obligations without an evidentiary hearing; (2) in the judge's rejection of the purchaser's argument that seller was obligated to provide utilities for purchaser's Revel property; and (3) in assessing counsel fees.[4]

I

First, as for the relevant terms of the contract — quoted earlier — there is no doubt the parties never agreed the seller would be obligated to sue for the removal of either or both restrictive covenants. Nor is there any doubt that the existence of those restrictions was well known to the purchaser; the contract repeatedly refers to them and contains the purchaser's stipulation

---

[4] We find no merit in purchaser's arguments that the judge erred in granting injunctive relief. The judge applied the familiar standards, see Crowe v. De Gioia, 90 N.J. 126, 132-34 (1982); Waste Mgmt. of N.J., Inc. v. Morris Cnty. Mun. Auth., 433 N.J. Super. 445, 451-55 (App. Div. 2013), and, in his discretion, determined that injunctive relief was warranted to preserve the status quo pending resolution of the merits. We also reject the purchaser's contention that the judge should not have resolved the dispute's merits on the return date of the order to show cause. Because there was no genuine factual dispute standing in the way of the judge's declaration as to the meaning of the contract's unambiguous terms, purchaser's complaint about the procedure, arguably supported by Solondz v. Kornmehl, 317 N.J. Super. 16, 19-20 (App. Div. 1998), exalts form over substance. We find insufficient merit in these arguments to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

that the property was being purchased "as is" and that the purchaser "agree[d] to [p]urchase the [p]roperty notwithstanding the risks attendant to" the restrictions. Although the contract did not require that seller remove either or both restrictions, it did grant the seller rights if relief was obtained; that is, section 4(a), which designated the "time and place" of the closing, specifically declared that closing would occur within ninety days (on or before July 2), but it also "provided that" seller possessed the right to "cancel" before expiration of the ninety days "if, and only if, [s]eller is unable to resolve to [p]urchaser's satisfaction" the limitations posed by the restrictions. The words of the passage suggested that only the seller had a right to cancel if it could not obtain relief from the restrictions, and declared that it was <u>purchaser's</u> satisfaction that governed the sufficiency of any efforts. This choice of words raises five central questions about its meaning.

The first is whether the contract contemplated that seller could make efforts to remove the obstacles posed by the restrictions. It could.

The second question is whether seller actually made efforts to remove the restrictions. It did. There was no dispute that seller communicated with the restriction holders on that score, albeit without success.

9                                                    <span>A-1618-15T3</span>

The third question is, as purchaser argued in the trial court and here, whether the seller had an obligation to sue the restriction holders for relief. Clearly, the contract itself expressed no such obligation.[5] The purchaser, however, argues that, in the absence of a clear and unambiguous expression of the scope of the seller's efforts, those efforts are to be gauged by the legal obligations imposed by the implied covenant of good faith and fair dealing. Our view of this contention requires some explanation.

The covenant of good faith and fair dealing is implied in all contracts. Sons of Thunder v. Borden, Inc., 148 N.J. 396, 420 (1997). It arises from the general notion that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Ibid. The covenant "cannot override an express term in a contract," but "a party's performance under a contract may breach

---

[5] For example, the parties could have stipulated that seller was obligated to commence suit in a court of competent jurisdiction and could not cancel until exhausting those efforts. They could have also included an obligation to pursue any appeal rights and only after a final decision on appeal could seller cancel. Their contract contains no such obligations. Indeed, given the fact that the contract presupposed a relatively quick closing, no reasonable person would suspect an intention that seller litigate the obstacles posed by the restrictions to the point of an adverse decision in the trial court or a final decision on appeal before being entitled to cancel pursuant to section 4(a), which applied only for the ninety days that followed the contract's execution.

A-1618-15T3

that implied covenant even though that performance does not violate a pertinent express term." Wilson v. Amerada Hess Corp., 168 N.J. 236, 244 (2001).

The covenant has been found to apply in three general circumstances. As we recognized in Seidenberg v. Summit Bank, 348 N.J. Super. 243, 260 (App. Div. 2002), the covenant has been applied: (1) when a contract fails to provide a term necessary to fulfill the parties' intentions, Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 182 (1981); (2) when a contracting party performs in bad faith even though its performance did not necessarily breach any express contractual term, Sons of Thunder, supra, 148 N.J. at 420; and (3) to assess the performance of a party that retained a degree of discretion regarding its contractual performance, Wilson, supra, 168 N.J. at 250-51.

Without any particular clarity — or, more importantly, without any factual assertions — as to which aspect of this concept should have been applied, purchaser contends in its appeal brief that seller breached the implied covenant by "failing to take any reasonable legal action to resolve the outstanding conflicting restrictions." Specifically, in its brief, purchaser asserts that the seller should have filed quiet title actions to remove the restrictions. But purchaser has not particularized which of the covenant's three aspects should be considered, i.e., whether

11

purchaser seeks a performance by the seller that was omitted from the contract, Onderdonk, supra, 85 N.J. at 182, whether seller acted in bad faith even though it acted consistently with the letter of the contract, Sons of Thunder, supra, 148 N.J. at 420, or whether seller had the discretion to decide the extent to which it would exert its energies in resolving the restrictions on the property, Wilson, supra, 168 N.J. at 250-51.

In considering these possibilities — and in recognizing that the implied covenant serves a narrow purpose and that it should not "impos[e] unintended obligations upon parties [or] destroy[] the mutual benefits created by legally binding agreements," Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 92 (3d Cir. 2000); see also Seidenberg, supra, 348 N.J. Super. at 262 — it is important to observe that the contract's language that does relate to seller's attempts to remove the restrictions appears in the context of a passage that presents a ground upon which only seller would have the right to cancel: "[s]eller may cancel . . . if, and only if, [s]eller is unable to resolve" the restrictions. Put in this context, what purchaser would have the court do is impose a greater obligation on seller than that stated in the contract when, even if there was such an obligation, it was only a prerequisite for the seller's unilateral right to cancel. Stated another way, the purchaser complains seller did not take sufficient

steps to create the ground upon which seller could unilaterally cancel prior to July 2, 2015. We do not see how that alleged failure frustrated purchaser's reasonable expectations; the right emanating from the alleged implied promise to litigate the restrictions belonged only to the seller.

In addition, the reach of the implied covenant in a particular setting is governed by the facts and the parties' goals and intentions. Id. at 262-63. To generate a factual dispute about the surrounding circumstances, the dissatisfied party is obligated to provide evidential material suggestive of the implied covenant's application. What is unusual here is purchaser's failure to offer any sworn statements in responding to the order to show cause, let alone a sworn statement to support its argument that seller frustrated its expectations by failing to commence lawsuits directed toward clearing title of the restrictions. Purchaser's complaint and counterclaim were not verified, and purchaser presented no affidavit or certification to support the contention that purchaser expected greater efforts from seller regarding the removal of the restrictions. Because the purchaser presented nothing evidential but the contract itself, the trial judge correctly rejected the claim that the implied covenant imposed greater obligations on seller than expressly set forth in the

13

contract or that would appear to be a reasonable extension of the parties' contractual expressions.

Our fourth question concerns the meaning of the reference to the grounds for seller's right to unilaterally cancel prior to July 2. The provision in question states that the relief seller obtained from the restrictions would be judged by whether it met "purchaser's satisfaction."[6]

To be sure, in this regard, the parties did not clearly express their intentions about what it was that would permit seller to unilaterally cancel the contract prior to July 2. Seller has argued that the emphasized phrase constituted "a scrivener's error" and that it was "seller's satisfaction" not "purchaser's satisfaction" that the parties intended to insert, because the seller sought to retain the right to use the property as an "island campus" if it could obtain relief from the restrictions. We agree this is the most sensible reading, as removal of the restrictions to seller's satisfaction would enable it to operate an "island

_____

[6] For the reader's convenience, we again repeat the salient part of the provision at length. After expressing that the closing would occur on a date within ninety days, i.e., by July 2, the provision also provided "[s]eller may cancel this [a]greement by giving written notice to such effect to [p]urchaser at any time during such ninety[-]day period if, and only, if [s]eller is unable to resolve to [p]urchaser's satisfaction title issues pertaining to the [Trump and Caesars restrictions] whereupon the [e]scrow (with all interest earned thereon) shall be released to [p]urchaser and the parties shall be released of all further obligations."

campus," the very intention that generated its interest in the property in the first place. Indeed, the purchaser seems not to contradict seller's argument on this point. If seller's efforts had to satisfy seller's satisfaction, then there is no basis for inferring an implied covenant for seller to make greater efforts than seller desired. Moreover, whether the efforts had to satisfy seller or purchaser is ultimately irrelevant, because that satisfaction was a prerequisite only for seller's right to cancel before July 2, 2015, and it never exercised that right.

All of what we have said about the provision in question is mere prologue to the fifth and last question. Whatever might have been argued about the provision's meaning, it is undisputed that the provision granted only the seller the right to cancel before July 2, 2015. And, as is also undisputed, the seller waived that unilateral right to cancel. Consequently, it makes no difference if seller's efforts in seeking relief from the restrictions could be said to be inadequate. Those efforts — whether strenuous or half-hearted — would have only generated seller's unilateral right to cancel, and seller waived that right.

That waiver left the parties with the obligation to close by July 2; if they did not, then, absent further agreement, "either party" possessed the right to "terminate" the contract and, upon termination, "neither party" would incur "any further rights,

A-1618-15T3

obligations or liabilities whatsoever" and purchaser would be entitled to the return of its $26,000,000, with accrued interest, from escrow. In short, before July 2, only seller had the right to terminate depending upon its efforts to remove either or both restrictions. And, if the parties did not close by July 2, both parties possessed the right to terminate. When purchaser refused to close on July 2, seller declared the contract terminated.

For all these reasons, we find no merit in purchaser's argument that a proper interpretation of the implied covenant of good faith and fair dealing prohibited entry of a judgment declaring the contract's termination. Seller's alleged failure to do more to remove the restrictions — purchaser's only asserted ground for application of the implied covenant — had no bearing on the contract's termination.[7]

---

[7] Purchaser has also argued that its claim of unjust enrichment should have been permitted to proceed. In this regard, purchaser complains that the seller was able to "use the $26,000,000 deposit as a starting point for higher bids" and enriched itself as a result. To be sure, that $26,000,000 sat in escrow pending closing or pending its return upon a termination of the contract was a fact; to the extent seller might have utilized that fact as the means of obtaining some other offer on the property following termination does not suggest seller was unjustly enriched. Purchaser's claim to relief must be based on a contractual or quasi-contractual theory of liability, Castro v. NYT Television, 370 N.J. Super. 282, 299 (App. Div. 2004); Caliano v. Oakwood Park Homes Corp., 91 N.J. Super. 105, 108-09 (App. Div. 1966). For reasons already stated, there is no merit in any of purchaser's contractual, implied-contractual, or quasi-contractual theories

Purchaser also contends seller was obligated to provide energy for purchaser's neighboring Revel facility notwithstanding the contract's termination. The contract, in fact, acknowledged an obligation to provide energy, if requested by the purchaser, between the contract's effective date and throughout the ninety-day period that followed; this provision also permitted an extension if requested by the purchaser. Of particular interest is the provision's acknowledgement that this agreement "survive[s]" the contract's termination.[8]

---

of recovery. Consequently, the claim of unjust enrichment lacked a proper foundation.

[8] The provision's relevant portion states:

> Between the [e]ffective [d]ate and ninety (90) days thereafter, subject to further extension if [p]urchaser so requests, in its sole discretion on a month-to-month basis of successive months until [p]urchaser obtains alternative energy sources, [s]eller shall provide [p]urchaser with power, electricity, and hot and cold water ("[e]nergy"), from its energy facility for use by [p]urchaser in and for its Revel . . . facilities. . . . This [s]ection . . ., and the obligation of [s]eller to provide the [e]nergy and the rights of [p]urchaser to purchase the [e]nergy, shall be an independent contractual obligation and survive the termination of this [a]greement and [s]eller's election to not

The survival language is particularly relevant because the purchaser made no demand for energy until August 31, 2015, months after both the contract's termination and the commencement of this litigation, and three weeks after the trial judge rendered what would have been a final judgment but for the quantification of the counsel fee award.

Like its other arguments, purchaser provided no sworn statement that disclosed or suggested the parties' particular intentions about this energy agreement.[9] Instead, purchaser relies solely on the language of the applicable contractual provision. In considering the provision's overall tenor — as illuminated by the indisputable circumstances as to when the request was made and the property's status at that time — we conclude seller's agreement to supply energy: (1) obligated purchaser to make a demand for energy by July 2, i.e., within the ninety-day period between the effective date and the anticipated closing date; and (2) survived only if the termination occurred pursuant to seller's exercise of

---

> proceed to [c]losing as set forth in section 4(a)[.]

[9] In support of the motion, purchaser's attorney submitted his own certification, which merely attached the relevant portions of the contract, and copies of letters exchanged by counsel on this subject. The certification otherwise presented only an argument about the contract's language; it did not disclose or suggest any information about the parties' intentions.

its unilateral right to cancel that, as we have already observed, seller waived.

In arguing the energy provision survived the contract's termination, purchaser provides a convoluted explanation, which depends on the particular placement or absence of commas, for how the energy provision imposed a continuing obligation beyond the contract's termination and the commencement of litigation. Purchaser first urges our consideration of the comma prior to "subject" in the provision's opening phrase, i.e., "Between the [e]ffective [d]ate and ninety (90) days thereafter, subject to further extension if [p]urchaser so requests, . . . [s]eller shall provide . . . ." Purchaser contends that the placement of the comma prior to "subject" and the absence of a comma between "further extension" and "if [p]urchaser so requests" demonstrates that the request for an extension relates to an extension of the ninety-day period and not of a further extension of the supply of energy that was provided pursuant to a timely request. Stated another way, the purchaser asserts that it had the contractual right to extend the time for the initial commencement of a transfer of energy beyond the ninety-day period and that the right to request an extension did not depend on it having made an initial request within the ninety-day period.

A-1618-15T3

We find no merit in this argument that the placement or absence of commas demonstrates the plausibility of his strained interpretation. We need only invoke what the Supreme Court recognized many years ago:

> Punctuation marks are rarely, if ever, an infallible token of intention, for punctuation is to a large degree arbitrary and very often a matter of individual taste unrelated to the expression of the intention, and the comma is frequently employed merely to indicate rhetorical pauses and interruptions in continuity of thought and sometimes with an eye to structure without regard to precision in the delineation of the common purpose. Although not to be entirely ignored, punctuation cannot be allowed to control the meaning of the words chosen to voice the intention.
>
> [Casriel v. King, 2 N.J. 45, 50 (1949); accord Perez v. Zagami, LLC, 218 N.J. 202, 210-11 (2014) (recognizing the same approach in interpreting the meaning of statutes).]

The polestar, as our jurisprudence has firmly established, is not governed by the decision to insert or delete a comma but the intention of the parties "as disclosed by the language used, taken as an entirety," including "the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain." Casriel, supra, 2 N.J. at 50; see also Jacobs v. Great Pacific Century Corp., 104 N.J. 580, 586 (1986). So, while the presence or absence of a comma will not necessarily be ignored, courts find a greater appreciation for the parties'

20                                                              A-1618-15T3

intentions from context, Schenck v. HJI Assocs., 295 N.J. Super. 445, 452-53 (App. Div. 1996), certif. denied, 149 N.J. 35 (1997), the contract's design, Krosnowski v. Krosnowski, 22 N.J. 376, 387 (1956); Allied Bldg. Prods. Corp. v. J. Strober & Sons, LLC, 437 N.J. Super. 249, 261-62 (App. Div.), certif. denied, 220 N.J. 207 (2014), and an overwhelming sense of a provision when considered as a whole, Borough of Princeton v. Bd. of Chosen Freeholders of Cnty. of Mercer, 333 N.J. Super. 310, 325 (App. Div. 2000), aff'd, 169 N.J. 135 (2001). This concept was never more elegantly expressed than when Judge Learned Hand wrote that the meaning of a provision "may be more than that of the separate words, as a melody is more than the notes, and no degree of particularity can ever obviate recourse to the setting in which all appear, and which all collectively create." Helvering v. Gregory, 69 F.2d 809, 810-11 (2d Cir. 1934).

Purchaser's exaltation of the provision's punctuation — in the absence of sworn statements to support the interpretation urged — runs counter to the common sense of the undertaking. A "mature and developed jurisprudence" neither makes "a fortress out of the dictionary," Cabell v. Markham, 148 F.2d 737, 739 (2d Cir.), aff'd, 326 U.S. 404, 66 S. Ct. 193, 90 L. Ed. 165 (1945), nor, for that matter, "a fortress out of The Elements of Style," Sayles v. G & G Hotels, Inc., 429 N.J. Super. 266, 274 (App. Div.), certif.

21

denied, 213 N.J. 537 (2013). To be sure, the parties were careless in describing the extent to which the right to energy might survive the contract's termination. The only harmonious and nonsensical result, however, is one that required the purchaser's request for energy within the ninety-day period and one that would survive only seller's exercise of its unilateral right to terminate prior to July 2. No other interpretation is plausible in light of the parties' overall intentions.

We, thus, reject purchaser's contention that the judge erred in denying his motion to compel seller to provide purchaser's neighboring property with energy.

III

Purchaser lastly argues that the trial judge erred in awarding counsel fees because the seller's application was inadequate and left the judge to speculate in quantifying a reasonable fee.[10]

To be sure, there were deficiencies in the fee application. As is often the case, the moving party assumed the attachment of the law firm's invoice to the client would provide the court with

---

[10] Purchaser has not argued the fee award was unauthorized. The contract expressly declared that "in the event either party files a lawsuit . . . in connection with this [contract] . . . then the party that prevails in such action shall be entitled to recover . . . reasonable attorneys' fees and costs incurred in such action."

enough information to make the findings required by <u>Rendine v. Pantzer</u>, 141 <u>N.J.</u> 292, 334-37 (1995). But, as the trial judge painstakingly explained in his comprehensive written opinion, those deficiencies resulted in a drastic reduction of the amount sought in fees and expenses from $81,863.34 to $44,570.84. In other words, where the judge was unsure about what services the attorneys performed, he simply denied the particular request. We will not second-guess the experienced judge. In fact, we affirm in this regard substantially for the reasons set forth in the judge's thorough written decision.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION